PER CURIAM.
Jesse Earl Scheuing was indicted for murder made capital pursuant to § 13A-5-40(a)(2), Ala.Code 1975, because it occurred during a robbery in the first degree of Sean Adam Cook. In a related case, Scheuing was also indicted for theft of property in the first degree for the theft of a 2003 GMC Yukon sport-utility vehicle, pursuant to I 13A-8-3, Ala.Code 1975. On May 6, 2010, the State moved the circuit court to consolidate the two cases for trial, and, on June 1, 2010, following a hearing, the court granted the motion.
The jury unanimously found that the State had proven beyond a reasonable doubt that Scheuing had committed the capital offense while under a sentence of imprisonment, and it recommended, by a vote of 10 to 2, that he be sentenced to life in prison without the possibility of parole. The jury also found Scheuing guilty on the theft charge. The circuit court sentenced Scheuing to death for his capital-murder conviction and to 60 years in prison as a habitual offender for his theft conviction. Scheuing appeals his convictions and sentences. After careful review, this Court affirms.
The evidence at trial tended to demonstrate the following. In August 2008, Scheuing was released on parole in the State of Georgia. He had been convicted of thefts of automobiles, breaking and entering into automobiles, escape, and being a felon in possession of a firearm. James Potts, a friend of Scheuing who lived in Alabama, went to Georgia and brought Scheuing to Alabama to stay with Potts and his wife, Tifani Kulp. On November 20, 2008, Scheuing failed to report to his parole officer as required by the terms of his parole.
A couple of days before Thanksgiving, Scheuing stole a Kia Sportage automobile from Dean Jakiel’s driveway. Jakiel had borrowed the Sportage from Lani Harrison, his daughter, and had parked it in his driveway, leaving the keys in the ignition. Also left in the Sportage was Jakiel’s loaded, .38 caliber, five-shot, hammerless Smith and Wesson revolver and a box of ammunition for the gun. Within a day or two after stealing the Sportage, Scheuing *253 abandoned the vehicle, but he kept the gun and ammunition that was in the vehicle.
On November 26, 2008, the day before Thanksgiving, Potts took Scheuing to the home of Sean Cook, who was a friend of Potts. While there the three men smoked marijuana, and Cook sold a small amount of marijuana to Potts and Scheuing. That night, Potts, Kulp, and Scheuing gave Jeanette Rutledge, a friend of Potts and Kulp, a ride to her home. During the ride, Potts told her that he had a .38 caliber pistol in the car.
Shortly after midnight on November 28, 2008, Scheuing decided to rob a store to get money to buy Potts an Xbox 360 video-game console and to get transportation to Grand Rapids, Michigan, where Scheuing wanted to meet a woman he had communicated with in an Internet chat room. Scheuing, Potts, and Kulp got into Potts’s car, with Potts driving and Scheuing sitting in the back seat behind him. Sometime during the ride, Scheuing twice test fired the gun he had stolen from the Spor-tage by shooting it out the car window; he did this to learn the gun’s characteristics when fired. Also at some point during the night, Scheuing decided that he was going to kill whomever he robbed. The three drove around trying to find a place that would be easy to rob. They rejected most of the stores they saw because the clerks were enclosed in bullet-proof glass; they also rejected a Waffle House restaurant because it had too many customers. Scheu-ing finally decided that the target would be the Pak-a-Sak[1] convenience store in Oxford. Although Potts and Kulp knew that Cook worked at the store as a cashier, they did not recognize him as the cashier when they drove by the store that morning.
Potts parked the car a couple of blocks behind the Pak-a-Sak store. Scheuing walked to the store; he had the .38 caliber pistol in the back pocket of his pants. When Scheuing walked up to the store, Cook, who had to push a button to allow someone to enter the store, recognized Scheuing and allowed him in. Scheuing briefly spoke with Cook before asking where the restroom was. Scheuing had planned to put on a hockey mask he had with him while in the restroom, but, because Cook had recognized him, Scheuing decided not to use the mask. There were three customers in the store when Scheu-ing first entered, so he went into the restroom and waited until he heard them leave. After leaving the restroom, Scheu-ing walked to the counter where he talked with Cook about various topics. As they spoke about marijuana and the “mun-ehies”[2] (State’s Exhibit 96), Scheuing said that he was hungry and walked to the candy aisle. There, where Cook was unable to see what Scheuing was doing, Scheuing moved the .38 caliber pistol from his pants pocket to his coat pocket. With his hand in the coat pocket containing the pistol, Scheuing then walked back to the counter and continued speaking with Cook. Cook turned his head, looking out the window at a passing car; Scheuing pulled out the gun, and, when Cook turned back toward Scheuing, Scheuing shot him in the head. Scheuing then took the cash-register drawer and ran out the door. He went back to the car and told Potts and Kulp that he had shot Cook. The three returned to Potts’s home where Scheuing and Potts took the money from the cash-register *254 drawer. The two men then took the cash-register drawer to a remote road where they cleaned their fingerprints from the cash-register drawer and then abandoned it.
A short time after Scheuing left the store, Mary De La Zerda, a regular customer of the Pak-a-Sak store and an acquaintance of Cook’s, arrived there. When she first entered the store, De La Zerda called for Cook because she did not see him. After getting no response from him, she noticed that the counter area was in disarray. De La Zerda again called for Cook and, receiving no response, walked behind the counter where she found him lying on floor. She then went outside and telephoned emergency 911.
Officer Jake Durham of the Oxford Police Department was dispatched to the Pak-a-Sak store in response to the 911 call and was the first officer to arrive on the scene. After speaking with De La Zerda, Officer Durham entered the store with Officer Eric Hood and Officer Jamie Clark. Once inside, Officer Durham noticed that the cash-register drawer was missing and that “items were out in the floor and strewn all over the place.” (R. 542.) After seeing Cook lying on the floor, Officer Durham alerted the other officers of the situation and had them separate. Officer Durham went “straight through the building back toward the cooler and the bathroom areas” (R. 543) while Officer Hood went down the aisles and Officer Clark went behind the counter. Officer Clark saw Cook on the floor and noticed that “[h]e had some vomit around his mouth,” “had a very gray complexion,” and “appeared to be deceased.” (R. 635.) After not finding anyone else in the building, the officers went back outside, put up crime-scene tape, and secured the scene until someone from the investigation division of the police department arrived.
Justin Edwards, a paramedic, also responded to the 911 call. When he arrived at the Pak-a-Sak store, he was informed by a police officer of what had been found in the store. When Edwards went into the store, he noticed that Cook was blue, was not moving, and that “his brain matter was on the floor next to him,” and Edwards determined that Cook was dead. (R. 564.)
After Scheuing and Potts disposed of the cash-register drawer, they went to a Walmart retail store where they purchased an Xbox 360, an Oblivion video-game cartridge for the video-game console, and a Playstation 2 video-game cartridge. The Playstation 2 cartridge was purchased so Scheuing would have something to play while Potts was playing Oblivion. While they were playing the games at Potts’s house, Cook’s teenage brother called Potts and threatened him, Kulp, and their son. Cook’s brother made the threats because he believed that Potts had shot Cook.
Due to the telephone call, Potts decided that they needed to get rid of the gun Scheuing had used to kill Cook. Scheuing, Potts, and Kulp got back into Potts’s vehicle. While they were driving over a bridge, Scheuing threw the gun and the ammunition out of the passenger-side window and into a lake.
At the Pak-a-Sak store, investigators contacted a manager who came in and retrieved video from the recording equipment at the store. The video revealed that an individual wearing a black and red coat and a black hat with a skull on top came into the store and, after walking around the store and speaking with Cook, pulled a gun out of his coat pocket and fired one shot at Cook. The man then picked up the cash-register drawer and ran out the door. Investigator's were also able to obtain a video of a parking lot from another local business. That video showed the man who shot Cook getting out of the *255 back seat of a car and then returning to the back seat of the same car a few minutes later.
After dropping Kulp off at work, Scheu-ing and Potts went to the Greyhound bus station to purchase a ticket to Grand Rapids, Michigan. Because they had spent so much money on the video-game console and cartridges, Scheuing did not have enough money left to buy the bus ticket. Scheuing and Potts decided to stay away from Potts’s home for the day and that, in the evening, Potts would drop Scheuing off somewhere so Scheuing could steal a car to drive to Grand Rapids.
Scheuing and Potts spent the day together, smoking marijuana and selling game cartridges and memory cards. After picking Kulp up from work, Potts and Kulp dropped Scheuing off at an abandoned mobile-home park. Scheuing stashed his belongings at the mobile-home park, then stole a GMC Yukon sport-utility vehicle that belonged to Jackie Williams. After returning to the mobile-home park, Scheuing retrieved his belongings and began his drive to Grand Rapids.
Investigators were able to lift fingerprints from the counter of the Pak-a-Sak store, and one of those fingerprints belonged to Scheuing. After the story of the robbery-murder was televised during the local news, investigators received a tip informing them that Scheuing had been with Potts and of type of vehicle Potts drove. Based on that information, investigators went to Potts’s mobile home and received permission from him to search his vehicle and mobile home. While searching Potts’s car, investigators located a black and red jacket that matched the one worn by Scheuing when he shot Cook. Inside Potts’s mobile home, investigators found a hat matching the one Scheuing had worn while he was inside the Pak-a-Sak store. They also located a receipt from Walmart store that was generated shortly after the robbery and murder. The investigators went to the Walmart store and were able to secure a video showing Potts and Scheu-ing in the store purchasing the Xbox 360 and video-game cartridges. The cash-register drawer was recovered when a citizen, who lived on a dead-end road, reported that he had found it near his driveway.
When he got to Michigan, Scheuing went to meet the woman with whom he had communicated in the Internet chat room. She told him that because officers had contacted her and told her what he had done, she did not want anything to do with him. Thereafter, Scheuing left. While still in Michigan, Scheuing swapped the license plate on the Yukon with one on a truck parked at a Days Inn hotel. He then drove west into Iowa.
In Iowa, Scheuing stole Glenda Palmer’s purse at a Walmart store but, before Scheuing was able to leave the parking lot, another person opened the passenger door of the Yukon and took back the purse. Scheuing ran out of gas on an interstate highway and began walking. While doing so, Scheuing convinced people to give him money on three separate occasions. On December 4, 2008, Scheuing used the money to buy a bus ticket to St. Louis, Missouri, which was as far as he could afford to travel with the money the people had given him, and he rented a room at the Red Carpet Inn motel in Knoxville, Iowa. The employee of the motel who rented the room to Scheuing had seen a story about him on the evening news and telephoned law enforcement. Scheuing was apprehended that afternoon.
The next day, Special Agent Adam DeCamp and Special Agent Don Schnitker of the Iowa Division of Criminal Investigations interviewed Scheuing after he waived *256 his Miranda[3] rights. During the first part of the interview, Scheuing told Agent DeCamp and Agent Schnitker that he alone decided to rob a store to get money to buy Potts an Xbox 360 and to get money he could use to go to Michigan. He told the agents that he had taken Potts’s vehicle without Potts’s knowledge and had driven to the store. Scheuing detailed his time inside the Pak-a-Sak store, including how he had shot Cook, and told them that after he had disposed of the gun, ammunition, and cash-register drawer, he went back to Potts’s house where he woke up Potts and told him that he was giving the money to him as a gift without telling him its source. The two of them, Scheuing said, then went to a Walmart store where they bought the video-game console and video-game cartridges. Scheuing further stated that he told Potts what he had done to get the money only after Cook’s brother had threatened Potts.
During a break in the interview, the agents contacted investigators in Alabama and relayed to them the story Scheuing had given. When the interview resumed, the agents confronted Scheuing with the fact that they knew he was not telling the truth. Scheuing then told the truth about Potts’s involvement in the crime.
Following his extradition back to Alabama, Officer Michael Kane of the Weaver Police Department spoke with Scheuing about the theft of the Yukon. After he had executed a waiver-of-rights form, Scheuing wrote a statement for Officer Kane. In his statement Scheuing wrote that, around 8:00 p.m. on an “unknown date,” he stole a silver Yukon and drove to Grand Rapids, Michigan. (State’s Exhibit 34.) He further wrote that he then drove to Iowa where he “eventually ran out of gas and left the vehicle on the entry ramp to the interstate.” (State’s Exhibit 34.) Scheuing also wrote that, before he had left Calhoun County, Alabama, he had taken the Yukon to an abandoned mobile-home park to get clothes he had left. In the mobile-home park, he left “most of the personal effects” that had been in the Yukon. (State’s Exhibit 34.) Scheuing concluded the statement by writing that he had “donated the clothes in the vehicle to Mel Trotters (sic) ministries.”[4] (State’s Exhibit 34.)
Officer Kane informed Lieutenant Charles Plitt of the Weaver Police Department of the information Scheuing had provided. Lt. Plitt went to a vacant mobile-home park in Weaver where the remains of an abandoned mobile home still stood. This place was known to him as a place where people hid and disposed of stolen property. At the driveway of that mobile home, he found Williams’s purse and other items.
Based on information supplied by Scheu-ing and Potts, investigators attempted to locate the gun by making multiple dives into the lake where the gun had been thrown. Despite those efforts, the gun was never located.
The autopsy of Cook’s body was performed by Dr. Valerie Green, a state medical examiner with the Alabama Department of Forensic Sciences. Dr. Green determined that Cook had a gunshot entrance wound “right in the center of the forehead.” (R. 596.) She also detected that there was stippling around the wound, which indicated that the gun was about three feet from Cook when he was shot. Dr. Green was able to trace the *257 path of the bullet, which went “front to back and left to right and slightly downward,” and was able to retrieve and clean the bullet. (R. 598.) She concluded that the cause of death was the “gunshot wound to the head” and that the manner of death was homicide. (R. 620.)
The bullet was examined by Dancy Sullivan, a forensic scientist with the Alabama Department of Forensic Sciences. Based on her examination of the bullet, Sullivan concluded that the “bullet was a .38 caliber class bullet loaded in [a] .38 Special caliber cartridge[ ].” (R. 816.) Sullivan expected that the bullet would have been fired by a “Smith & Wesson or similar .38 Special caliber fírearm[ ] or Ruger, Smith & Wesson, Taurus, or similar caliber .357 caliber ñrearm[ ].” (R. 816.)

Standard of Review

Because Scheuing has been sentenced to death, this Court applies the standard of review set out in Rule 45A, Ala. RApp. P., which requires that:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
The Alabama Supreme Court has explained:
“ ‘ “To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”’ Ex parte Bryant, 951 So.2d 724, 727 (Ala.2002) (quoting Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)). In United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the United States Supreme Court, construing the federal plain-error rule, stated:
“‘The Rule authorizes the Courts of Appeals to correct only “particularly egregious errors,” United States v. Frady, 456 U.S. 152, 163 (1982), those errors that “seriously affect the fairness, integrity or public reputation of judicial proceedings,” United States v. Atkinson, 297 U.S. [157], at 160 [ (1936) ]. In other words, the plain-error exception to the contemporaneous-objection rule is to be “used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.” United States v. Frady, 456 U.S., at 163, n. 14.’
“See also Ex parte Hodges, 856 So.2d 936, 947-48 (Ala.2003) (recognizing that plain error exists only if failure to recognize the error would ‘seriously affect the fairness or integrity of the judicial proceedings,’ and that the plain-error doctrine is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result’ (internal quotation marks omitted)).”
Ex parte Brown, 11 So.3d 933, 938 (Ala.2008).
“The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.” Hall v. State, 820 So.2d 113, 121 (Ala.Crim.App.1999). Although Scheuing’s failure to object will not bar this Court from reviewing any issue, it will weigh against any claim of prejudice. See Dill v. State, 600 So.2d 343, 352 (Ala.Crim.App.1991).
With these principles in mind, this Court addresses the issues Scheuing has raised in his appellate brief.
*258 I.
Scheuing first argues that, pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the “trial court erred by failing to find a prima facie showing of racial discrimination.” (Seheuing’s brief, at 9.) Although, at trial, Scheuing objected to the State’s peremptory strikes of only three veniremembers, he now argues error as to each strike of an African-American veniremember made by the State.
The record demonstrates that, following the striking of the jury, defense counsel “object[ed] under Batson to [the] striking of Juror Number 95 who is a black female, [G.C.]” (R. 466.) The circuit court confirmed that three members of the jury were African-American females. The defense, in response to an inquiry by the circuit court regarding the basis of the objection, said: “Again, she’s a black female, and I believe they left other similarly-situated white females, white males on the jury. I mean, it’s not based on a cause strike obviously at this point. She said she could vote for life or the death penalty.” (R. 467.) The circuit court asked the State whether it had any response. The State replied with a question, asking the circuit court whether it had found a prima facie case of discrimination. The circuit court responded that it had not. The defense next raised “object[ions] on the same basis” (R. 468) to the strikes of D.W. and C.G., both of whom, like G.C., are African-American females.
The trial judge then said:
“I’ve watched the striking process of the state, not only in this case but over a great many years. I have not observed a process or a pattern of the state striking minority jurors in a systematic way. I don’t find evidence of past conduct by the state in using their challenges to strike all minorities from the jury panel.
“As is noted there are three minority jurors out of the 12 on this panel. If you start looking statistically, obviously that’s 25 percent minority makeup of this particular jury. The minority makeup of this county and certainly of this circuit doesn’t rise to that level of 25 percent. From that perspective the minority makeup of this jury would be higher than that countywide in Calhoun and certainly higher than the circuit wide in the counties of Calhoun and Cleburne. I don’t find that the state has in the voir dire in this case — I haven’t found their voir dire to be delusory in any way, their questioning just as extensive of minority members of the jury panel as of the majority members, that their questioning of both was relatively extensive and certainly meaningful and balanced. I don’t find there to be any disparaging treatment by the minority members of this panel as compared to the treatment in the voir dire examination of the majority members. From all of that I find that there has been no prima facia showing of a Batson violation, and I therefore deny the defendant’s motion.”
(R. 470-71.)
Although Scheuing objected at trial to only three of the State’s peremptory strikes, he does not differentiate those strikes from the other strikes of which he now complains but, rather, presents arguments based on the State’s removal of “8 of the 12 qualified African Americans from the jury venire” and asserts that “this Court must remand for the trial court to determine whether the prosecutor can come forward with race-neutral reasons for [the] strikes.” (Scheuing’s brief, at 8, 19.) This Court, however, will separately address the strikes to which he objected at trial and the ones to which he did not.
*259 A.
As noted above, Scheuing specifically objected to the State’s strikes of D.W., C.G., and G.C. “A determination regarding a moving party’s showing of intent to discriminate under Batson[ v. Kentucky, 476 U.S. 79 (1986),] is ‘“a pure issue of fact[,] subject to review under a deferential standard.” ’ ” Williams v. State, 55 So.3d 366, 371 (Ala.Crim.App.2010) (quoting Armstrong v. State, 710 So.2d 531, 534 (Ala.Crim.App.1997), quoting in turn Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). This Court “ ‘ “will reverse a trial court’s decision only if the ruling is clearly erroneous.” ’ ” McCray v. State, 88 So.3d 1, 17 (Ala.Crim.App.2010) (quoting Vanpelt v. State, 74 So.3d 32, 54 (Ala.Crim.App.2009), quoting in turn Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001)). “ ‘[T]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.’ ”• Id. (quoting Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997)).
The Alabama Supreme Court, in Ex parte Branch, 526 So.2d 609 (Ala.1987), provided the following list demonstrating the types of evidence that can be used to raise an inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their membership in the group— and that in all other respects they [were] as heterogeneous as the community as a whole.’ ...
“2. A pattern of strikes against black jurors on the particular venire....
“3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire.
“4. The type and manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions.
“6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner....
“7. Disparate examination of members of the venire....
“8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury.
“9. The state used peremptory challenges to dismiss all or most black jurors.”
Ex parte Branch, 526 So.2d at 622-23 (citations omitted).
At trial, Scheuing gave as the basis for his objection about G.C. that, “[a]gain, she’s a black female, and I believe they left other similarly-situated white females, white males on the jury. I mean, it’s not based on a cause strike obviously at this point. She said she could vote for life or the death penalty.” (R. 467.) The objections as to D.W. and C.G. were raised “on the same basis.” (R. 468.) The only basis for the objections before the circuit court, therefore, was whether these three women could vote for the death penalty. This corresponds to the sixth Branch factor. The juror questionnaire in this case included question 82, which asked: “Are you in favor of the death penalty?” In response to that question, G.C., D.W., and C.G. all checked the “No” box. Every single veniremember who was selected to serve on the jury, including the two alternates, checked the “Yes” box in answer to that question. Thus, G.C., D.W., and C.G. were not similarly situated with any member of the jury, regardless of race or gender.
*260 Scheuing has failed, at both the circuit court level and in his argument before this Court, to meet his burden “ ‘of establishing a prima facie case of discrimination.’” McCray v. State, 88 So.3d at 17 (quoting Ex parte Brooks, 695 So.2d at 190). The circuit court’s ruling was not clearly erroneous, and it did not err in denying Scheu-ing’s Batson motion.
B.
To the extent Scheuing challenges the State’s use of its peremptory strikes to remove African-American veniremembers that were not included in his objections at trial, this Court holds that Scheuing has failed to meet his burden to establish that plain error occurred. Rule 45A, Ala. R.App. P
1.
Scheuing argues that “[t]he State’s improper use of peremptory strikes to remove African Americans from the jury is evident simply in the number of African-American veniremembers struck.” (Scheuing’s brief, at 10.) According to Scheuing, the State’s use of 8 peremptory strikes[5] to remove 8 of 12 African-American veniremembers raises an inference of discrimination. This Court disagrees.
Although Scheuing asserts that “Alabama courts have frequently found a prima facie case of discrimination in cases with numbers similar to those here” (Scheuing’s brief, at 12), the most recent case he cites was decided in 1995. This Court has, however, as recently as 2005, written that “statistics and opinion alone do not prove a prima facie case of discrimination.” Banks v. State, 919 So.2d 1223, 1230 (Ala.Crim.App.2005) (citing Johnson v. State, 823 So.2d 1 (Ala.Crim.App.2001)). See also Stanley v. State, 143 So.3d 230, 254 (Ala.Crim.App.2011) (“this Court has held that numbers or percentages alone will not substantiate a case of discrimination in this context”). Because Scheuing merely makes a numerical argument, this factor weighs against him.
Moreover, this Court has held that the State’s use of peremptory strikes to remove six or nine African-American venire-members, without more, does not raise an inference of racial discrimination. See Johnson v. State, 823 So.2d 1, 20 (Ala.Crim.App.2001) (“Johnson noted only that the State used 6 (less than half of its 14) strikes to remove 6 of the 9 blacks from the venire, and that, in his counsel’s opinion, no articulable reason for the strikes was revealed during voir dire. We do not find the statistics or defense counsel’s assertions that in his opinion no legitimate reasons for the strikes were revealed during voir dire to be sufficient to establish a prima facie case of racial discrimination.”). Here, the State’s use of peremptory strikes to remove 8 of 12 African-American veniremembers does not raise an inference of racial discrimination.
Further, as the circuit court noted, three African-Americans served on Scheuing’s jury; therefore, 25% of the jurors were African-American. According to the circuit court, African-Americans makeup less than 25% of the general population of the circuit. The facts that the State left three African-Americans on the jury and that the jury consisted of a greater percentage of African-Americans than live in the circuit tend to indicate that the State did not use its peremptory strikes in a racially discriminatory manner. See McCray v. State, 88 So.3d 1, 24 (Ala.Crim.App.2010) *261 (“ ‘ “Of course, the fact that blacks are ultimately seated on the jury does not necessarily bar a finding of discrimination under Batson[ v. Kentucky, 476 U.S. 79 (1986) ], see [United States v.] Battle, 836 F.2d [1084,] 1086 [ (8th Cir.1987) ], but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the [same race].” United States v. Young-Bey, 898 F.2d 178, 180 (8th Cir.1990).’” (quoting Mitchell v. State, 579 So.2d 45, 48 (Ala.Crim.App.1991), quoted with approval in Ex parte Thomas, 659 So.2d 3, 7 (Ala.1994)) (emphasis omitted)).
Based on the foregoing, this Court holds that the number of strikes used by the State to remove African-Americans from the jury does not raise an inference of racial discrimination.
2.
Scheuing next argues that “the heterogeneous nature of the struck prospective jurors indicates that the only characteristic they shared was their race, which raises an inference of discrimination.” (Scheuing’s brief, at 14.) Although he provides this Court with an overview of the “ages, occupations, and social or economic conditions” (Scheuing’s brief, at 13) of the African-American veniremembers who were struck by the State, Scheuing fails to convince this Court that those “ ‘jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.’ ” Ex parte Branch, 526 So.2d at 622 (quoting People v. Wheeler, 22 Cal.3d 258, 280, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978)).
This is because, as the State illustrates in its appellate brief, “six of the eight [African-American potential] jurors [peremptorily struck by the State] indicated they opposed or would be reluctant to impose the death penalty even if it were justified by the evidence.” (State’s brief, at 32.) This Court has held that opposition to, or reluctance to impose, a sentence of death is a valid concern for the State when striking a jury in a capital case. See, e.g., Hyde v. State, 778 So.2d 199, 223 (Ala.Crim.App.1998); see also Talley v. State, 687 So.2d 1261, 1269 (Ala.Crim.App.1996) (opposition to the death penalty was “a sufficiently gender-neutral reason” for a peremptory strike). The State also correctly points out that “[t]heir hesitancy on the death penalty also distinguishes them from the African-American jurors who ultimately served on the jury, none of whom gave any indication they might be reluctant to vote for the death penalty.” (State’s brief, at 32-33.) Everyone who served on the jury, including the alternates, indicated in the jury questionnaire that they were in favor of the death penalty.
The other two African-American venire-members who were struck by the State gave answers in their questionnaires that distinguished them from everyone who served on the jury, regardless of race. For example, A.G. answered question 30— which asked: “Have you ever had an unpleasant experience involving law enforcement?” — by writing, “I survived being shot at run [sic] over by law enforcement.” (Questionnaire of A.G.) No other venire-member reported such an incident. Further, question 29 — which asked: “Have you or any member of your family ever been arrested or charged with a criminal offense?” — was answered by A.G. with notations indicating that the question applied to his nephew and brother and that the charges were robbery and drug possession, a crime similar to the one for which *262 Scheuing was on trial.[6] (Questionnaire of A.G.) Similarly, S.C. reported that his brother had been arrested or charged with robbery and kidnapping, a crime similar to the one for which Scheuing was on trial. (Questionnaire of S.C.) See Lee v. State, 898 So.2d 790, 814 (Ala.Crim.App.2001) (recognizing that striking a prospective juror because a relative has been convicted of a crime is race neutral).
This Court has reviewed the record, and it does not appear that the African-Americans who were struck by the State were “ ‘as heterogeneous as the community as a whole.’ ” Ex parte Branch, 526 So.2d at 622 (quoting Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905). Therefore, this factor does not support an inference of discrimination.
3.
Next, Scheuing asserts that “[t]he African-American veniremembers were de-mographieally similar to white venire-members who sat on [his] jury.” (Scheuing’s brief, at 15-16.) He arrives at this conclusion by viewing the venire through a wide lens, addressing characteristics such as age, area of residence, marital status, etc. Based upon this viewing, he argues that “[t]his type of disparate treatment of similarly situated white and black veniremembers raises a strong inference of discrimination.” (Scheuing’s brief, at 17.)
As established in subsection I.B.2., however, when viewing the same venire through a lens narrowly focused on issues of importance to attorneys striking a jury for a capital murder, it is apparent that there was no “disparate treatment of similarly situated white and black venire-members [that] raises a strong inference of discrimination.” (Scheuing’s brief, at 17.) The record demonstrates that, considering the attitudes concerning the imposition of the death penalty and the arrest of family members for conduct similar to that alleged during the trial, there was no inference of discrimination. This factor, like the others, weighs against Scheuing.
4.
Scheuing also asserts that an inference of discrimination exists because “[t]he District Attorney’s Office of Calhoun County has a history of discriminatory striking.” (Scheuing’s brief, at 17.) In support of this claim, he lists six cases, the most recent of which was decided in 1995, none of which, as Scheuing acknowledges, “were reversed on Batson[ v. Kentucky, 476 U.S. 79 (1986),] grounds.” (Scheuing’s brief, at 18.)
The circuit judge, who -presided over two of the cases Scheuing cites in support of this argument, in ruling that Scheuing had not established a prima facie case of discrimination, stated:
“I’ve watched the striking process of the state, not only in this case but over a great many years. I have not observed a process or a pattern of the state striking minority jurors in a systematic way. I don’t find evidence of past conduct by the state in using their challenges to strike all minorities from the jury panel.”
(R. 470.)
Nothing in the record establishes that the circuit court was clearly erroneous in finding that the prosecutor did not have a history of discrimination. Therefore, this factor does not raise an inference of discrimination.
*263 Finally, Seheuing does not argue that the remaining Branch factors support an inference of discrimination, but this Court notes that there does not appear to be a pattern to the State’s peremptory strikes of African-Americans or that different questions were posed to African-Americans. Rather, the record indicates that whites and African-Americans were questioned similarly.
Base on the foregoing, this Court holds that there was no inference of discrimination in the peremptory strikes made by the State. Therefore, this issue does not entitle Seheuing to any relief.
II.
Seheuing asserts that it was error for the prosecution to have “introduced a wealth of irrelevant and impermissible victim impact evidence at the guilt phase of this capital trial.” (Scheuing’s brief, at 21.) He argues alleged errors during the testimony of Cook’s mother, who was the State’s first witness at trial and testified during the prosecutor’s rebuttal. Because Seheuing did not object to any of the instances on which he bases his complaint, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
Before addressing these claims of error alleging improper admission of prejudicial victim-impact evidence, this Court notes that, from the beginning of the guilt phase of the trial, the defense, in light of the overwhelming evidence against Seheuing, pursued a strategy of admitting that he had committed the capital crime and seeking a sentencing recommendation of life in prison without the possibility of parole. During voir dire, the defense individually questioned each member of the venire, asking their opinion on the appropriate punishment for a case involving an intentional killing that was committed without justification, accident, or grounds for self-defense.
In the opening statement of the guilt phase, defense counsel told the jury:
“Let me start out and tell you this case is tragic. There’s no other way I can say it. It’s a tragedy that Sean Cook is dead. It’s a tragedy for his family because they don’t have a son, brother, friend. There’s no justification. There’s no excuses and there’s no mistakes.”
(R. 509.) Later in the opening statement, defense counsel said:
“What the evidence is going to be is that Jesse Seheuing came up from Way-cross, Georgia, with his friend James Potts who is married to Tifani Kulp. At some point, probably two days or so before Thanksgiving he steals a Kia Sportage, and in that Kia Sportage is a .38 special pistol.
“James Potts, Tifani Kulp, and Jesse Seheuing all go to Pak-A-Sak in Oxford late, late the 28th, November 28th, 2008. Jesse gets out of the car, goes into the store, talks to Sean Cook who he had met a day or two before, talked for seven, eight minutes. Then Jesse pulls out a gun and shoots him.
“They leave the store. James Potts and Jesse get rid of the gun, wipe down the cash drawer, dispose of the cash drawer, go to Wal-Mart and buy an Xbox 360.”
(R. 510.)
Seheuing cross-examined only 5 of the 27 State witnesses who testified. Further, during the guilt-phase closing argument, Scheuing’s counsel told the jury that Seheuing “[cjould have pled guilty, I suppose, would have been the only other thing he could have done. But, again, the death penalty is on the table. If they weren’t *264 seeking to try to kill him, I assure you he would have pled guilty.” (R. 906.)
With those portions of the record in mind, this Court addresses Scheuing’s claim of error.
. A.
Scheuing argues that the State improperly elicited victim-impact testimony from Elaine Dockery, Cook’s mother. He alleges that this testimony occurred on two occasions. First, he asserts error in the following testimony:
“Q. Tell me how you first heard that Sean had been killed.
“A. Ooh. A police officer came to our door and woke us up that morning and asked could she come in and talk to us. And I said is Sean okay. She said I have to come in and -talk to you; I need to come in and talk to you. And then’ she told us that he was shot.
“Q. Okay. And I often ask this question of family members and only somebody that’s gone through this type of a loss can understand it. The funeral process and all of the initial things that you go through when you lose a loved one that often is a blur. But victim’s moms sometimes tell me that there’s a moment down the road where they realize he’s not around anymore. Did you have a moment like that?
“A. Yes.
“Q. If you’ll tell us about that, please. “A. It’s when I saw my baby laying in that casket. He was so different than before. They had took so much from him. He was an organ donor. He didn’t even look like himself hardly. That’s when I realized, and I wanted to crawl in there with him. And his brother — I still don’t know if he’s accepted it. I don’t think I’ve ever seen him cry. It’s just hard. It’s really hard. He don’t want to know that his brother is not coming back. That was his best friend.”
(R. 515-16.) Second, Scheuing asserts the same error in the following testimony:
“Q. Can you tell me a little bit about now, your life now that Sean is not around? Tell us some of the impact that you’ve had by losing him.
“A. Well, Jesse has been in and out of trouble. He’s in Camp Lewis right now. I have to work all the time. Paying the bills is hard to do. We have no transportation. Sean always made sure that we had transportation wherever we went. It’s just our lives are so empty. That night when Sean was taken from us he took something from us too. He took part of my heart with him.”
(R. 517.)
Scheuing argues that “it would have been impossible for jurors to disregard such emotionally compelling testimony.” (Scheuing’s brief, at 24.)
“ ‘Although the failure to object will not preclude [plain-error] review, it will weigh against any claim of prejudice.’ Sale v. State, 8 So.3d 330, 345 (Ala.Crim.App.2008). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).
“The Alabama Supreme Court has held that victim-impact statements:
“ ‘are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible. See C. Gamble, McEl *265 roy’s Alabama Evidence § 21.01 (4th ed.1991), citing, inter alia, Fincher v. State, 58 Ala. 215 (1877) (a fact that is incapable of affording any reasonable inference in reference to a material fact or inquiry involved in the issue cannot be given in evidence). If the statements are not material and relevant, they are not admissible.’
“Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993).
“ ‘[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law.’ Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). The Court in Ex parte Rieber also said:
“ ‘However, in Ex parte Crymes, 630 So.2d 125 (Ala.1993), a plurality of this Court held in a capital murder case in which the defendant was sentenced to life imprisonment without parole that a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’
“663 So.2d at 1005.”
Woodward v. State, 123 So.3d 989, 1021 (Ala.Crim.App.2011).
The appellant in Woodward argued that much of the testimony of the victim’s widow regarding the victim was improper victim-impact evidence. Id. at 1020. In reviewing the record under the plain-error standard, this Court agreed that some of the testimony about which Woodward complained was irrelevant and inadmissible. That evidence consisted of testimony about where and how the widow and victim met, that the victim, on the day he was shot, joked about an exercise machine he had recently purchased, that the victim had regularly donated plasma, and that the victim and the widow “both had a policy to give of themselves to others.” Id. at 1021. This Court concluded-, however, “that the irrelevant portions of [the victim’s widow’s] testimony did not operate to deny Woodward a fair trial or otherwise prejudice a substantial right of Woodward’s” and “that it did not affect the outcome of the trial, that it did not prejudice Woodward’s substantial rights, and that it did not rise to the level of plain error.” Id. at 1022.
During the guilt phase of the trial, the only potential prejudice Scheuing could have faced from Dockery’s testimony would have been the jury’s relying on that testimony to find him guilty. When compared with the defense strategy, which was to admit guilt and focus on a favorable sentencing recommendation, this Court concludes that Dockery’s testimony “did not affect the outcome of the trial, that it did not prejudice [Scheuing’s] substantial rights, and that it did not rise to the level of plain error.” Id. at 1022.
B.
Scheuing also complains that, during guilt-phase rebuttal argument, the prosecutor said:
“Sean Cook mattered to his mother, to his father, to his friends, to his family. He mattered. Sean Cook’s life still matters. It matters more than an Xbox 360 and a video game. His life matters. Show that his life matters. Hold this man responsible. I’m asking you to find him guilty of capital murder and theft of property. Show these people that Sean *266 Cook matters today. Sean Cook was 27 years old. Thank you.”
(R. 911-912.)
The statement made by the prosecutor came after defense counsel, during closing argument, told the jury that “the death penalty is on the table. If they weren’t seeking to try to kill him, I assure you he would have pled guilty.” (R. 906.)
Just after the prosecutor concluded his rebuttal, the circuit court instructed the jury as follows: “Remember, ladies and gentlemen, what the attorneys have had to say is not evidence in the case. Again, don’t be putting their statements or arguments to you in the evidence category.” (R. 912.) The circuit court later provided this instruction to the jury:
“What the attorneys have had to say, both for the state and for the defendant, they are not any evidence in these cases. What they have argued to you at various points in the trial is not evidence. They certainly have the right and a duty at appropriate times in the trial to comment on the evidence and to urge you to draw reasonable inferences from the evidence as they argue their respective positions to you. But what the attorneys have to say is not evidence. And you should put what they say in a proper category in your thinking, and it should not be in the evidence category, just as the indictment in the cases should not be placed in the evidence category.”
(R. 916-17.)
Additionally, the court instructed the jury that “[t]he law permits nothing but legal evidence presented before the jury to be considered in support of any charge brought against the accused.” (R. 917-918.)
We have noted, as has the Alabama Supreme Court, that:
“ ‘It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Scheuing] did not receive a fair trial simply because the jurors were told what they probably had already suspected — that [Sean Cook] was not a “human island,” but a unique individual whose murder had inevitably had a profound impact on [his] children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)).’ ”
Woodward, 123 So.3d at 1022 (quoting Ex parte Rieber, 663 So.2d at 1006).
As with Scheuing’s complaint regarding Dockery’s testimony, this Court holds that, when viewed against the backdrop of the defense strategy and the statements made by defense counsel, the statement made by the prosecutor during rebuttal “did not affect the outcome of the trial, ... did not prejudice [Scheuing’s] substantial rights, and ... did not rise to the level of plain error.” Id. at 1005.
III.
Scheuing next argues error in the “prosecutor’s unlawful assertion that the jury could reject Mr. Scheuing’s mitigation evidence if it found no causal connection between them and the offense.... ” (Scheu-ing’s brief, at 32.) Because Scheuing failed to object to any of the prosecutor’s statements of which he now complains, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
During the penalty phase, Scheuing called Joann Terrell, “an expert in the field of social work and forensic social work” as a witness. (R. 1162.) Terrell testified that, based upon Scheuing’s histo *267 ry, she had identified seven mitigating factors. Those factors were: 1) exposure to alcohol during the “first trimester of his biological mother’s pregnancy”; 2) disruption of and damage to his attachment at an early age; 3) neglect during the first year of life; 4) failure to “learn how to self-regulate his impulses as a result of the damage to his attachment abilities”; 5) lack of “consistent or appropriate treatment to deal with” the first four mitigation factors; 6) a childhood in a permissive household that allowed antisocial behavior without appropriate or consistent discipline; and 7) “a clinical dependence on marijuana for which [Scheuing] did not receive treatment, and [which] interferes with his judgment and impulse control.” (R. 1180-82.)
During closing argument of the penalty phase, defense counsel reviewed each of the seven mitigating factors with the jurors. Regarding the first factor, defense counsel stated: “How did it affect him? That’s your job to decide.” (R. 1249.) Next, in addressing the second factor, defense counsel stated: “How did that affect him? What ultimate outcome did that have on Jesse? I can’t tell you. That is for you to weigh and determine.” (R. 1250.) In addressing the fourth factor, counsel stated: “What effect did [his biological mother’s[7]] involvement have on that? It’s your job to decide.” (R. 1250-51.) When talking about the fifth factor, defense counsel asked the jury, “[w]ould it have made a difference if [Scheuing] had gotten treatment? I don’t know.” (R. 1251.) Defense counsel next, while speaking about the sixth factor, asked whether what his adoptive mother “cause[d] Jesse to shoot Sean Cook? No. None of these things I’ve talked about caused him to shoot Sean Cook.” (R. 1252.) Defense counsel told the jury that, “[o]f all the mitigators we’ve talked about, I hate that one the worst. You choose to smoke marijuana, don’t you? Did anyone hold a gun to Jesse’s head and make him smoke marijuana? No. Does smoking marijuana typically make people violent, dangerous criminals? No.” (R. 1253.) Counsel then went on to tell the jury that the clinical depem dence on marijuana was raised as a mitigating factor to demonstrate that Scheuing used it as a form of self-medication.
During his rebuttal argument, as had defense counsel, the prosecutor reviewed each of the seven mitigating factors. As to the first factor, the prosecutor reminded the jury that there was no evidence indicating that Scheuing suffered from fetal-alcohol syndrome. He then, regarding the second factor, stated: “[W]hat did that have to do with the way this young man turned out or what he did on November the 28th? They can’t show you. I can’t show you. All they’re saying is his momma left him.” (R. 1263.) The prosecutor, referring to the fourth factor, asked what Scheuing’s failure to self-regulate his impulses had “to do with it when what he did had nothing to do with impulse whatsoever” and also asked, based on the facts, “[w]here has that impulse got anything to do with what he did?” (R. 1264.) In addressing the seventh factor, the prosecutor reminded the jurors that, during his interview in Iowa, Scheuing had said that, before going to the Pak-a-Sak store, neither he nor Potts had been smoking marijuana and that he was lucid. The prosecutor concluded his review of the mitigating factors by noting that Scheuing did not receive treatment for his attention-deficit/hyperactivity disorder (“ADHD”) and by stating: “Everybody has got ADHD it seems like. He didn’t get treatment for *268 his. That doesn’t turn you into a killer. That may make it difficult for you to learn to read and that type of thing, but that’s the only thing it does.” (R. 1268.)
Scheuing now argues that the “clear import of the prosecutor’s statements was that unless Jesse Scheuing could establish a direct correlation between the circumstances of the offense and his mitigation evidence, it was the jury’s duty to disregard it.” (Scheuing’s brief, at 28.)
This Court has explained that, “[i]n judging a prosecutor’s closing argument, the standard is whether the argument ‘ “so infected the trial with unfairness as to make the resulting [sentence] a denial of due process.” ’ Darden v. Wainmight, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).” Sneed v. State, 1 So.3d 104, 138 (Ala.Crim.App.2007). Further, “ ‘ “a prosecutor has the right to ‘reply in kind’ to statements made by defense counsel in the defense’s closing argument.” Ex parte Musgrove, 638 So.2d 1360, 1369 (Ala.1993), cert. denied, Rogers v. Alabama, [513] U.S. [845], 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).’ Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995).” Newton v. State, 78 So.3d 458, 478 (Ala.Crim.App.2009).
First, contrary to Scheuing’s argument on appeal, the prosecutor was not attempting to persuade the jury that it could not consider mitigation unless Scheuing established a causal connection between the mitigation and the murder. Instead, the prosecutor argued that the mitigation should be given little if any weight because there was no connection between it and the murder. In Vanpelt v. State, 74 So.3d 32 (Ala.Crim.App.2009), this Court recognized that “ ‘[a] prosecutor may present an argument to the jury regarding the appropriate weight to afford the mitigating factors offered by the defendant,’ ” Malicoat v. Mullin, 426 F.3d 1241, 1257 (10th Cir.2005), and may argue that mitigation evidence should not be given much weight. 74 So.2d at 90-91 (citing State v. Scott, 286 Kan. 54, 183 P.3d 801, 844 (2008)). Further, “the sentencer may ... consider ‘causal nexus ... as a factor in determining the weight or significance of mitigating evidence.’ ” Poyson v. Ryan, 711 F.3d 1087, 1098 (9th Cir.2013). Accordingly, the prosecutor may argue to the jury that it should give little or no weight to offered mitigation when there is no causal connection between the mitigation and the crime. Because the prosecutor simply argued that the mitigation evidence offered by Scheuing should be given little or no weight because there was no connection between the mitigation and the crime, no error, much less plain error, occurred. See Rule 45A, Ala. R.App. P.
Moreover, the comments made by the prosecutor were either a response to statements made by defense counsel or an attempt to remind the jury of what they had heard in evidence. They did not “ ‘ “so infeet[ ] the trial with unfairness as to make the resulting [sentence] a denial of due process.” ’ Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)).” Sneed, 1 So.3d at 138.
IV.
Scheuing next argues that the circuit court erred in not removing the jury foreman because, between the guilt and penalty phases, “the bailiff unlawfully communicated ... his opinion that Jesse Scheuing should be executed.” (Scheu-ing’s brief, at 33.) Because Scheuing did not object to T.K., the foreman, being left *269 on the jury after the communication was made known, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
The communication giving rise to this allegation of error occurred on Friday, September 17, 2010, when, before the penalty phase of the trial, T.K. was walking into the courthouse following a recess. He overheard one of the bailiffs, who was speaking with a security officer, say, “they ought to fry that — .” (R. 955, 957.) The bailiff then “put both hands over his mouth and his eyes got wide.” (R. 957.) On Monday, September 20, 2010, the circuit court had a conversation in chambers with T.K. without the presence of counsel. In that conversation, T.K. informed the circuit court about the incident and told the circuit court that he had made an assumption that the bailiff was talking about Seheuing’s case. The following exchange between the court and T.K. then occurred:
“THE COURT: Good. Again, I want to ask you if — having heard that statement and you’ve made some assumptions about its meaning—
“[T.K.]: Yes, sir.
“THE COURT: — having heard what you heard would that in any way affect or impact or have a bearing on your job as a juror in this case and as foreman?
“[T.K.]: I have not made a decision on this case at this time. I haven’t heard the prosecution this morning. I have not heard the defense this morning. I have not came up (sic) to a conclusion.
“THE COURT: You’re telling me that it would not affect you in any way?
“[T.K.]: Absolutely.
“THE COURT: All right.”
(R. 957-58.)
After the circuit court had, without T.K.’s presence, informed the attorneys of what had transpired between the bailiff and T.K., the following exchange occurred in chambers with T.K. and all attorneys present:
“THE COURT: [T.K.] is back in chambers. [T.K.], I called the attorneys in, went over with them our conversation—
“[T.K.]: Yes, sir.
“THE COURT: — and what you related to me had happened and informed them that you tell me that that event, those words you heard, will not have any impact on your further duties and responsibilities as a juror in the case; is that correct?
“[T.K.]: Yes, sir.
“THE COURT: Am I correct that you’re telling me you can completely put that out of your mind so far as being evidence in the case—
“[T.K.]: Yes, sir.
“THE COURT: — and that you’ll give it absolutely no weight, no consideration, in your responsibilities in this case?
“[T.K.]: Yes, sir.”
(R. 960.)
After sending T.K. out of chambers, the trial court then brought him back in, and, in the presence of the attorneys, the following exchange occurred:
“THE COURT: Sure. That ... incident has not affected your responsibilities or your deliberations as a juror previously on last Friday?
[T.K.]: No, sir.
THE COURT: And then you’ve told me it won’t affect you in carrying out your further responsibilities as a juror today or tomorrow?
[T.K.]: No, sir. I just thought it needed to be brought to your attention.
THE COURT: Yes, sir. All right. And you have, again, assured me that you can be a fair and an impartial juror in the case?
*270 [T.K.]: Absolutely.”
(R. 963.)
This Court first notes that the bailiff did not actually complete the sentence he began in T.K’s presence, and T.K. merely assumed that the bailiff was talking about the Scheuing case. However, assuming that the bailiff was talking about Scheuing, this issue does not warrant reversal. Citing Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), Ex parte Pierce, 851 So.2d 606 (Ala.2000), and Miles v. State, 261 Ala. 670, 75 So.2d 479 (1954), Scheuing asserts that this Court should find inherent prejudice in the incident because: 1) the foreman heard the bailiff “express statements concerning the proceedings”; 2) “the comments made by the-bailiff were themselves highly prejudicial and unlawful”; and 3) “the improper nature of these comments was only accentuated by the fact that they were uttered before sentencing even began.” (Seheu-ing’s brief, at 34-37.) This Court disagrees.
Because they deal with contacts between trial witnesses and jurors, the cases on which Scheuing relies are inapposite to his. This Court has explained that, “[i]n both Turner[ v. Louisiana, 379 U.S. 466 (1965),] and [Ex parte ] Pierce, [851 So.2d 606 (Ala.2000),] prejudice was presumed because of the close and continual contact between the key witness and a juror.” Gobble v. State, 104 So.3d 920, 950 (Ala.Crim.App.2010). Likewise, the conviction in Miles was reversed because the sheriff and a highway patrolman, both of whom would later testify at trial, accompanied by the chief deputy sheriff who had been active in the investigation, walked with the jurors to a restaurant, ate at the same table with them, and walked back to the courthouse with them. Miles, 75 So.2d at 479-84.
Although T.K. did not inform the circuit court exactly when the incident between himself and the bailiff had occurred, the record demonstrates that the incident occurred before the jury beginning its deliberations in the penalty phase.[8] At that time, the removal of T.K. would have been erroneous.
The record shows that, on Friday, September 17, 2010, after charging the jury, the circuit court released the alternates, placing no restrictions on them. Therefore, T.K. could not have been replaced by an alternate juror. Further, a capital case may not proceed with less that 12 jurors. Rule 18.1, Ala. R.Crim. P.; § 12-16-231 (c), Ala.Code 1975. Thus, the only option available to the circuit court was to grant a mistrial.
“Alabama courts have repeatedly held that a mistrial is a drastic remedy; it is to be used sparingly and only to prevent manifest injustice. The decision whether to grant a mistrial rests within the sound discretion of the trial court and the court’s ruling will not be overturned absent a manifest abuse of that discretion. E.g., Banks v. State, 919 So.2d 1223 (Ala.Crim.App.2005); Bryant v. State, 727 So.2d 870, 877 (Ala.Crim.App.1998).”
Bonner v. State, 921 So.2d 469, 473 (Ala.Crim.App.2005). Further, “[i]n Remmer v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court held that in order to determine the effect of third-party contact with a jury, the trial court should investigate the circumstances of the contact, its effect on the *271 jurors, and any prejudice to the defendant.” Dilbeck v. State, 594 So.2d 168, 177 (Ala.Crim.App.1991).
Here, the circuit court properly followed the process for addressing third-party contacts with jurors as outlined in Remmer. The circuit court “investigate[d] the circumstances of the contact, its effect on the juror[ ], and any prejudice to the defendant.” Dilbeck, 594 So.2d at 177. The circuit court instructed T.K. that the bailiffs comment was not evidence and should not be considered in his deliberations. (R. 956.) T.K. consistently and repeatedly assured the circuit court that the communication would not affect his decision in the case and that he could continue to be a fair and impartial juror. Scheuing’s attorneys were apparently so satisfied with T.K’s assurances that they moved neither for his removal nor for a mistrial based on the communication. Based on these facts, this Court holds that no error, much less plain error, resulted from the circuit court’s failure to declare a mistrial. Rule 45A, Ala. R.App. P.
V.
Scheuing also argues error in the introduction of evidence relating to “three other theft offenses.” (Scheuing’s brief, at 37.) Those thefts to which he refers were: 1) the theft of Harrison’s Kia Sportage; 2) the theft of Jakiel’s .38 caliber pistol from that Sportage; and 3) the theft in Iowa of the purse belonging to Palmer. Because Scheuing did not object to the introduction of any evidence relating to these thefts, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
Scheuing specifically argues that the admission of evidence regarding those thefts violated Rule 404(b), Ala. R. Evid, which reads:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.”
This Court has explained that
“evidence regarding uncharged crimes or acts may properly be admitted under the following circumstances:
“ ‘ “Evidence of the accused’s commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence.” C. Gamble, McElroy’s Alabama Evidence (3d ed.1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App.1984). “Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Crim.App.1981). See also Moseley v. State, 357 So.2d 390 (Ala.Crim.App.1978); Summers v. State, 348 So.2d 1126 (Ala.Crim.App.), cert. denied, 348 So.2d 1136 (Ala.1977).” Pettaway v. State, 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence “was intimately connected with the *272 same transaction which is the basis of the State’s case.... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State’s case-in-chief rests within the sound discretion of the trial judge.” Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987), and cases cited therein. “The trial court did not err in overruling appellant’s objection to the admission of such evidence. No matter how many distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged.” Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein.’ ”
Connell v. State, 7 So.3d 1068, 1085-86 (Ala.Crim.App.2008) (quoting Rowell v. State, 570 So.2d 848, 852 (Ala.Crim.App.1990)). This Court has further instructed:
“Alabama has long recognized the following exceptions to the general exclusionary rule now contained in Rule 404(b), Ala. R. Evid.:
“ ‘ “These exceptions fall under the following general divisions: (1) Relevancy as part of res gestae. (2) Relevancy to prove identity of person or of crime. (3) Relevancy to prove scienter, or guilty knowledge. (4) Relevancy to prove intent. (5) Relevancy to show motive. (6) Relevancy to prove system. (7) Relevancy to prove malice. (8) Relevancy to rebut special defenses. (9) Relevancy in various particular crimes.” ’
“Scott v. State, 353 So.2d 36, 38 (Ala.Crim.App.1977), quoting Wharton’s Criminal Evidence, § 31.
“As Professor Charles Gamble explained:
“ ‘Evidence of the accused’s commission of another crime or act is admissible if such other incident is inseparably connected with the now-charged crime. Such collateral misconduct has historically been admitted as falling within the res gestae of the crime for which the accused is being prosecuted. Most modern courts avoid use of the term “res gestae” because of the difficulty in measuring its boundaries. The better descriptive expression is perhaps found in the requirement that the collateral act be contemporaneous with the charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence. This is believed to be the ground of admission intended when the courts speak in terms of admitting other acts to show the “complete story” of the charged crime. The collateral acts must be viewed as an integral and natural part of the circumstances surrounding the commission of the charged crime.
“ ‘Two theories have been adopted for justifying the admission of collateral misconduct under the present principle. Some courts hold that such contemporaneous acts are part of the charged crime and, therefore, do not constitute ‘other crimes, wrongs, or acts’ as is generally excluded under Rule 404(b). Other courts hold that Rule 404(b) is applicable to these collateral acts but that they are offered for a permissible purpose under that rule — i.e., that such acts are merely offered, rather than to prove bad character and conformity therewith, to show all the circumstances surrounding the charged crime.’
*273 “C. Gamble, McElroy’s Alabama Evidence § 69.01(3) (5th ed.1996) (footnotes omitted).
“ ‘[One such] “special circumstance” where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the history of the case and formed part of the natural development of the facts. Commonwealth v. Murphy, 346 Pa.Super. 438, 499 A.2d 1080, 1082 (1985), quoting Commonwealth v. Williams, 307 Pa. 134, 148, 160 A. 602, 607 (1932). This special circumstance, sometimes referred to as the “res ges-tae” exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible “to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.” ’
“Commonwealth v. Lark, 518 Pa. 290, 303, 543 A.2d 491, 497 (1988). Evidence of a defendant’s criminal actions during the course of a crime spree is admissible. See Phinizee v. State, 983 So.2d 322, 330 (Miss.App.2007) (‘Evidence of prior bad acts is admissible to “[t]ell the complete story so as not to confuse the jury.” ’); Commonwealth v. Robinson, 581 Pa. 154, 216, 864 A.2d 460, 497 (2004) (‘The initial assault on Sam-Cali took place approximately two weeks before the Fortney homicide and Sam-Cali’s testimony provided the jury with a “complete story” of Appellant’s criminal spree from the Burghardt homicide in August of 1992 to Appellant’s capture in July of 1993.’); St. Clair v. Commonwealth, 140 S.W.3d 510, 535 (Ky.2004) (‘Here, the trial court properly permitted the Commonwealth to introduce evidence of Appellant’s prior crimes and bad acts that were part of a continuous course of conduct in the form of a “crime spree” that began with Appellant’s escape from an Oklahoma jail and ended with his flight from Trooper Bennett.’); People v. Sholl, 453 Mich. 730, 556 N.W.2d 851 (1996) (‘ “Evidence of other acts is admissible when so blended or connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Charo, 156 Ariz. 561, 565, 754 P.2d 288, 292 (1988) (“‘The ‘complete story’ exception to the rule excluding evidence of prior bad acts holds that evidence of other criminal acts is admissible when so connected with the crime of which defendant is accused that proof of one incidentally involves the other or explains the circumstances of the crime.” ’); State v. Long, 195 Or. 81, 112, 244 P.2d 1033, 1047 (1952) (‘It is fundamental that the state is entitled to the benefit of any evidénce which is relevant to the issue, even though it concerns the commission of the collateral crimes. If evidence of a collateral crime tends to prove the commission of the crime charged in the indictment, the general rule of exclusion has no application.’); State v. Schoen, 34 Or.App. 105, 109, 578 P.2d 420, 422 (1978) (‘The evidence, therefore, was relevant to complete the story of the crime charged.... The state is not required to “sanitize” its evidence by deleting background information to the point that the evidence actually presented seems improbable or incredible.’).
“As we stated in Cothren v. State, 705 So.2d 849 (Ala.Crim.App.1997):
“‘We agree with the trial court’s ruling in receiving evidence of collateral offenses under the above exceptions. “The two crimes are intertwined and connected to such an *274 extent that they form one continuous transaction.” Bush [v. State ], 695 So.2d [70,] 86 [ (Ala.Crim.App.1995)]. C. Gamble, McElroy’s Alabama Evidence, § 70.01(12)(b) (5th ed.1996), in regard to the res gestae exception, states, “The prosecution may prove the accused’s commission of collateral crimes, wrongs or acts if the evidence warrants a reasonable inference that such other crime was a part of the same transaction as the now-charged homicide.”
“ ‘The appellant’s foremost argument regarding this issue does not dispute the exceptions to the general exclusionary rule, but rather, argues that the “common plan or scheme” exception does not apply to this particular capital offense. Specifically, he argues that because 12 hours had elapsed between the two murders, the act could not be part of one “common plan or scheme.” We disagree.
“ ‘In Ex parte Windsor, 683 So.2d 1042, 1053 (Ala.1996), the Alabama Supreme Court stated:
“ ‘ “The robbery and murder of Rayford Howard and the robbery and murder of Randall Earl Pepper occurred only hours apart, on the same day. Both victims were convenience store owners, and the crimes were factually similar. Therefore, the trial court did not err in admitting evidence regarding Windsor’s participation in the robbery and murder of Randall Earl Pepper.”
“ ‘See also Guthrie v. State, 616 So.2d 914 (Ala.Crim.App.1993).
“ ‘The Alabama Supreme Court in Windsor created no time limitation.
The facts of this case clearly establish that the collateral capital offenses were part of a continuous crime spree.’
“705 So.2d at 859-60.”
Doster v. State, 72 So.3d 50, 87-89 (Ala.Crim.App.2010).
A.
Scheuing argues that the State erroneously admitted evidence indicating that he stole the Sportage and the .38 caliber pistol. During November, but before Thanksgiving 2008,[9] Scheuing stole Harrison’s Sportage, which contained Jak-iel’s loaded .38 caliber pistol, the gun Scheuing used to kill Cook. The admission of the evidence of the theft of the Kia Sportage and the pistol, therefore, told the complete story of Scheuing’s crimes. That evidence also explained how Scheuing acquired the pistol he used to murder Cook.
Scheuing argues that the introduction of evidence regarding the thefts of the Spor-tage and the pistol was “unwarranted because it was entirely gratuitous” in light of the fact that the “entire shooting in [the] case was captured on videotape and, upon request, Mr. Scheuing gave a complete and candid confession.” (Scheuing’s brief, at 41.) The State, however, was not required to present minimal evidence establishing Scheuing’s guilt. Rather, the State had the right to fully prove Scheuing’s guilt with all relevant, admissible evidence.
Consequently, there was no error in the admission of the evidence regarding the theft of the Sportage and the pistol.
B.
Scheuing next argues that the State erroneously admitted evidence regarding the *275 theft of Palmer’s purse. During the interviews he gave to law-enforcement officers, Scheuing stated that he ran out of gas, went to a Walmart store, and tried to steal a purse. At trial, Scheuing stipulated to the State’s admission of Exhibit 35, which stated that, if she were called as a witness at trial, Palmer would have testified that:
“On or about December 3, 2008, Glenda Palmer was leaving the Wal-Mart in Newton, Iowa. A young, white male pulled her purse from her and began to run away. She began to chase the young, white male. The young, white male entered a gold Chevy Tahoe. A bystander reached into the gold Chevy Tahoe and took the purse away from the young, white male. The bystander returned the purse to Glenda Palmer. As the young, white male drove away he made an inappropriate hand gesture toward Glenda Palmer and the bystander.” [10]
(State’s Exhibit 35.)
He further stipulated to the State’s admission of Exhibit 36, which stated that, if Jerry Sheets were called as a witness, he would have testified that:
“On or about December 3, 2008, Jerry Sheets was in the parking lot of a Wal-Mart in Newton, Iowa. A young, white male pulled a purse away from a woman and began to run away. The woman chased the young, white male. The young, white male entered a gold Chevy Tahoe. Jerry Sheets reached into the gold Chevy Tahoe and took the purse away from the young white male. Jerry Sheets returned the purse to the woman. As the young, white male drove away he made an inappropriate hand gesture toward Jerry Sheets and the woman. Jerry Sheets noted that the gold Chevy Tahoe had Michigan plates which included the numbers 1213.”
(State’s Exhibit 36.)
Because Scheuing stipulated to the admission of State’s Exhibits 35 and 36, if any error occurred, it was invited. “Invited error applies in death-penalty cases and operates to waive the error unless the error rises to the level of plain error.” Boyle v. State, 154 So.3d 171, 187 (Ala.Crim.App.2013) (citation omitted).
This Court has explained:
“ ‘ “In a criminal prosecution the state may prove that the accused engaged in flight to avoid prosecution ... as tending to show the accused’s consciousness of guilt.... The state is generally given wide latitude or freedom in proving things that occurred during the accused’s flight.” C. Gamble, McElroy’s Alabama Evidence § 190.01(1) (3rd ed.1977). “Evidence of flight is admissible even though it is weak or inconclusive or if several days have passed since the commission of the crime.” Tate v. State, 346 So.2d 515, 520 (Ala.Crim.App.1977). Evidence of flight is admissible even though that evidence involves the commission of other crimes by the accused. See Tate, supra; Neal v. State, 372 So.2d 1331, 1344-45 (Ala.Crim.App.1979).’ ”
Eggers v. State, 914 So.2d 883, 918-19 (Ala.Crim.App.2004) (quoting Beaver v. State, 455 So.2d 253, 257 (Ala.Crim.App.1984)).
In Eggers, this Court addressed a claim of ineffective assistance of counsel that was based, in part, on an assertion that trial counsel should have objected to evi *276 dence establishing that, following the commission of a capital murder, the appellant “was arrested in Kentucky while riding in a stolen pickup truck....” Eggers, 914 So.2d at 916. This Court concluded that the admission of the
“evidence relating to his arrest in Kentucky was not offered to show his bad character by establishing that he had committed another crime. Rather, the evidence appears to have had a dual purpose: to establish a link between Eggers and the red Nissan pickup truck because, as noted above, Francis’s debit card was later found in that truck and to establish Eggers’s flight after the murder and, thus, his consciousness of guilt.”
Id. at 916.
Here, the admission of the evidence relating to Scheuing’s attempted theft of the purse was admitted to establish an attempt by Scheuing to continue his “flight after the murder and, thus, his consciousness of guilt.” Id. The evidence established that Scheuing had been headed toward the west coast. When he realized he was running low on gasoline, he attempted to steal Palmer’s purse. This provided the jury with circumstantial evidence that the purpose for the theft was to obtain money to purchase gasoline to help him continue his flight. The admission of the evidence regarding the theft of Palmer’s purse was not, therefore, plain error. Rule 45A, Ala. R.App. P.
VI.
Scheuing argues that the State improperly introduced evidence showing he had no remorse for killing Cook. The first reference of which he complains came during the direct examination of Investigator Bobby Yancey, who interviewed Scheuing. During Investigator Yancey’s testimony, the following exchange occurred:
“Q. Bobby, a couple of points there, to make sure I heard it correctly. He indicated to you that he was more upset about being incarcerated than what he had done?
“A. That’s correct.
“Q. And he actually told you in his own words I don’t feel any remorse for it?
“A. That’s right.”
(R. 863.) Scheuing also complains of the following statement, which was made during rebuttal closing argument of the penalty phase, when the prosecutor said:
“[Scheuing] tells you [Cook] just collapsed to the ground like a rag doll. The whole interview with DeCamp the defendant is rocking back and forth and he shows no emotion. He shows no emotion with Bobby Yancey. And he was nonremorseful when he talked with Officer Kane.”
(R. 910-11.)
Because Scheuing did not object at trial to either reference, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
A.
To the extent Scheuing argues that the State improperly elicited testimony relating to his lack of remorse in the guilt phase, his argument is without merit. This Court has held that evidence of a murder defendant’s lack of remorse is admissible because it tends to show intent. White v. State, [Ms. CR-09-0662, Aug. 30, 2013] — So.3d —, — (Ala.Crim.App.2013); Woods v. State, 13 So.3d 1, 26 (Ala.Crim.App.2007). See also Darby v. State, 145 S.W.3d 714, 721 (Tex.App.2004) (holding that the jury may infer intent to kill from the defendant’s lack of remorse). Therefore, no error, much less plain error, resulted from the testimony indicating that *277 Scheuing was not remorseful for killing Cook.
Moreover, in light of Scheuing’s defense strategy to admit guilt and to focus on sentencing, and the fact that the State’s evidence of Scheuing’s guilt was ironclad, even if there were error in the admission of evidence relating to his lack of remorse, such error would have been harmless. Ex parte Greathouse, 624 So.2d 208, 211 (Ala.1998) (recognizing that error could be harmless when the evidence of the defendant’s guilt is “virtually ironclad”). Therefore, this issue does not entitle Scheuing to any relief.
B.
To the extent Scheuing argues that the State improperly commented on his lack of remorse during its penalty-phase closing argument, this argument is likewise without merit. In Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999), this Court addressed and rejected a similar argument. During closing argument, the prosecutor in Melson stated: “ ‘Melson is a cold-blooded murderer. He didn’t blink one eye. He showed no remorse as he emptied an' eight-shot clip full of .45 slugs into four kids who were just trying to earn a decent living.’ ” Melson, 775 So.2d at 889 (emphasis added). Under a plain-error standard, this Court concluded that the “comments were clearly supported by the evidence presented at trial concerning the brutal nature of the murders” and did “not find that the comment on Mel-son’s lack of remorse ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Id. (quoting Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App.1989)).
In this case, the prosecutor simply reminded the jury of what it had seen and heard from the properly admitted evidence. He also reminded the jury that, when providing a written statement to Officer Kane, Scheuing was “uncaring and unremorseful.” (R. 697.) These comments, based upon evidence which had been properly admitted at trial, did not “ ‘so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.’ ” Melson, 775 So.2d at 889 (quoting Bankhead, 585 So.2d at 107). Therefore, this issue does not rise to the level of plain error. See Rule 45A, Ala. R.App. P.
VII.
Next, Scheuing argues that, during penalty-phase rebuttal closing argument, “the prosecutor unlawfully told members of the jury that they were to disregard any sympathy derived from the mitigation evidence presented by the defense.” (Scheuing’s brief, at 46.) The alleged error occurred when the prosecutor said: “Sympathy is not supposed to go out to the defendant in the form of this mitigation just because he allegedly had some type of a tough life.” (R. 1270-71.) Because Scheuing did not object when the statement was made, this Court’s review is limited to plain error. See Rule 45A, Aa. R.App. P.
As in Part III of this opinion, this Court must determine if the prosecutor’s penalty-phase argument “ ‘ “so infected the trial with unfairness as to make the resulting [sentence] a denial of due process.” ’ Phillips v. State, 65 So.3d 971, 1033 (Ala.Crim.App.2010) (citations and quotations omitted).” Wilson v. State, 142 So.3d 732, 760 (Ala.Crim.App.2010). Additionally, “ ‘ “[t]o rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.” ’ ” Ex parte Brawn, 11 So.3d 933, 938 (Ala.2008) (quoting Ex parte Bryant, 951 So.2d 724, 727 *278 (Ala.2002), quoting in turn Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998)).
In Thompson v. State, 153 So.3d 84 (Ala.Crim.App.2012), this Court addressed an argument
“that the prosecutor ‘denigrated the role of mitigation’ when he argued, in [penalty-phase] closing:
“ ‘They’re wanting you to look at the Defendant’s life up to a certain point, and they want you to forget about June the 7th of 2003, which is a moment, a date, a time, that defines this defendant’s life. You cannot look at this life without considering that date. You cannot ignore his crimes in evaluating this case. Sympathies are what they want you to look at; crimes are what the law requires.’ ”
Thompson, 153 So.3d at 172.
This Court found no error in the statement made by the prosecutor because the “argument was consistent with the instructions given by the court that it should not consider ‘passion, prejudice, or any other arbitrary factor’ when reaching its verdict.” Id.
Also, in Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010) this Court addressed a claim of error based, in part, on the prosecutor having “argued that the jury was not to consider sympathy in its deliberations .... ” Gobble, 104 So.3d at 980. This Court held:
“In upholding a prosecutor’s arguments that the jury should set aside its sympathies, we have stated:
“ ‘[I]n Haney v. State, 603 So.2d 368, 394-95 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), the prosecutor argued to the jury that it should set aside its sympathies in making its decision. This Court held that those comments were proper, stating that they were “no more than the prosecutor urging the jury not to be distracted by matters unrelated to the evidence, but to confine itself to the facts and the law.... The prosecutor’s remarks concerning sympathy, sympathy for children, and weaknesses are obvious efforts to prevent the jurors from considering emotional responses not based on the evidence, and they are permitted by [California v.] Brown [, 479 U.S. 538 (1987)].” Id. at 394.’
“Boyd v. State, 715 So.2d 825, 846 (Ala.Crim.App.1997).
“Also, the court on several occasions instructed the jury that arguments of counsel were not evidence in the case. There is no indication that the above arguments seriously affected Gobble’s substantial rights. We cannot say that the prosecutor’s arguments so infected the trial with unfairness that Gobble was denied due process. See Darden v. Wainwright, [477 U.S. 168 (1986) ].”

Id.

Here, as in Thompson, the judge instructed the jury:
‘Your determination concerning the existence of mitigating circumstances should not however be influenced by passion, prejudice, or any other arbitrary factors. Your determination should be based solely on the evidence presented and the law as I have explained to you.”
(R. 1287-88) (emphasis added). The prosecutor’s “argument was consistent with the instructions given by the court that it should not consider ‘passion, prejudice, or any other arbitrary factor’ when reaching its verdict.” Thompson, 153 So.3d at 167. Accordingly, the prosecutor’s comment did not “ ‘ “ ‘so infect[ ] the trial with unfairness as to make the resulting [sentence] a *279 denial of due process,’ ” ’ ” Wilson, supra, or rise to the level of plain error.
VIII.
Scheuing next argues that the circuit court erroneously instructed the jury that a confession was due greater weight than other evidence that had been admitted at trial. Because Scheuing did not object to the jury instructions when given the opportunity by the circuit court, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
Scheuing specifically argues that the following portion'of the circuit court’s guilt-phase instructions was erroneous:
“There has been testimony offered, ladies and gentlemen, in the case that the defendant prior to this trial has made an alleged statement or confession or what is also in the law called an admission against his interest. I want to tell you that such alleged confessions of guilt when deliberately and voluntarily made are among the most effectual and satisfactory proof that could be received in courts of justice.”
(R. 932-33.)
This Court cannot, however, read this segment of the circuit court’s instructions in isolation. The statement of which Scheuing complains was immediately followed by these additional instructions:
“Their value, however, depends on the supposition that they are deliberately made and precisely identified and on the presumption that a rational being will not make admissions prejudicial to one’s interest and safety unless when urged to do so by the promptings of truth and conscience.
“Therefore, ladies and gentlemen, I want to tell you that there is no rule of law that requires á jury to give equal credence or belief to every part of a purported confession. All parts of a purported confession are to be considered in the light of the surrounding circumstances, the motives which may have induced it, and its consistency with other evidence. And a jury without capriciously accepting or rejecting any part of the purported confession or an admission against interest can credit such parts as it finds reasons for believing and can reject such parts as it finds reasons for disbelieving.
“So, as I’ve said, in order to be considered by a jury a confession or an admission against interest must be one that was voluntarily made. In order for a jury to consider any confession or admission against interest the burden is on the state to satisfy the jury beyond a reasonable doubt that any such purported confession or admission against interest was a voluntary statement given by such defendant freely and without fear of punishment or hope of reward.”
(R. 933-34.)
On several occasions, this Court has considered and rejected claims of error similar to the one now raised by Scheuing. Most recently, in Doster v. State, 72 So.3d 50 (Ala.Crim.App.2010), this Court addressed a claim or error regarding this instruction:
“ ‘You are going to hear testimony in a few moments about a statement given by the defendant.
“ ‘And the law in this respect is that all statements, confessions, or statements against interest made by a defendant are presumed to be involuntary unless they are first shown to have been voluntarily made; that is, that the statement was made by the defendant freely and voluntarily and without any threat or fear or torture or the offer of hope of reward.
*280 “ ‘The burden is first upon the Court to determine whether or not you may hear the statement.
“ ‘And then the burden is on the State to satisfy you beyond a reasonable doubt that the statement of the defendant was a voluntary statement and was given by him without torture or the fear of punishment or hope of reward on the part of those 'who had him in custody at the time of the alleged giving and making of the statement.
“‘Now, in a moment I’m going to allow this statement into evidence. It will be before you as a part of the evidence case.
“ ‘However, you are not bound by any alleged statement or confession or statement against interest of the defendant.
“ ‘Though I will tell you that confessions of quilt when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of law.
“ ‘Though I’m allowing this statement to come in, whatever you, the jury, determine to be the truth of the matter is what counts.
“ ‘And, if you are satisfied that the statement was obtained unlawfully or by wrongful means such as torture or the threat of fear of punishment or hope of reward or anything like that you have a right to disregard such a statement.’ ”
Doster, 72 So.3d at 98-99. In upholding the conviction, this Court explained:
“ ‘ “ ‘In setting out the standard for plain error review of jury instructions, the court in United States v. Chandler, 996 F.2d 1073, 1085, 1097 (11th Cir.1993), cited Boyde v. California, 494 U.S. 370, 380 (1990), for the proposition that “an error occurs only when there is a reasonable likelihood that the jury applied the instruction in an improper manner.” Williams v. State, 710 So.2d 1276, 1306 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929 (1998).’ ”
“ ‘Broadnax v. State, 825 So.2d 134, 196 (Ala.Crim.App.2000), quoting Pilley v. State, 789 So.2d 870, 882-83 (Ala.Crim.App.1998). Moreover, “[w]hen reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999).” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).’
“Snyder v. State, 893 So.2d 488, 548 (Ala.Crim.App.2003).
“In Williams v. State, 782 So.2d 811 (Ala.Crim.App.2000), we considered a jury instruction that was virtually identical to the instruction in this case. In finding no reversible error, we stated:
“ ‘After reviewing all of the trial court’s instructions regarding confessions in the context of its entire oral charge, we conclude that they were not improper. They did not inform the jury that the trial court had determined that the appellant voluntarily made the statements, and they clearly instructed the jury that it was ultimately responsible for determining whether the appellant voluntarily made the statements. See Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988); Ex parte Singleton, 465 So.2d 443 (Ala.1985).’
“782 So.2d at 838. Earlier in Singletary v. State, 473 So.2d 556, 575 (Ala.Crim.App.1984), we upheld a similar instruction and noted:
*281 “ ‘There is some merit, we think, in the exception taken by defense counsel as to that part of the court’s oral charge in which he said “that confessions of guilt or statements against interest, when freely and deliberately made are among the most effectual and satisfactory proofs that can be received in courts of justice,” but upon consideration of the full context of the statement, we are convinced that it was not substantially harmful to defendant. Whatever tendency there was unfavorable to the defendant as to evidence of confessions or admissions was offset by what the court said favorable to defendant on the subject.’ ”
Id. at 99-100.
Here, when considering the entire jury instruction regarding Scheuing’s confessions, there is no “reasonable likelihood that the jury applied the instruction[s] in an improper manner.” Id. at 99. Further, in light of Scheuing’s defense strategy to admit guilt and to focus on sentencing, and the fact that the State’s evidence of Scheuing’s guilt was ironclad, any error in the jury instructions was harmless. Ex parte Greathouse, 624 So.2d at 211 (recognizing that error could be harmless when the evidence of the defendant’s guilt is “virtually ironclad”). Therefore, this issue does not entitle Scheuing to any relief.
IX.
Scheuing also asserts error regarding the prosecutor’s penalty-phase rebuttal closing argument in which he stated:
“I can’t tell funny stories about Sean Cook. Can’t tell funny stories about whether or not Sean Cook was saved by Richard Green or not. The reason is because Sean Cook is dead, and I mention that solely for this reason. I don’t want you to forget it.”
(R. 1260.)
Scheuing argues that this segment of rebuttal was error for two reasons. First, he asserts that, because the prosecutor “could have offered stories about Mr. Cook’s background, his relationships, and his attributes through his friends and family,” the statement “was wrong, as both a factual and legal matter.” (Scheuing’s brief, at 58-54.) Second, he argues that “by declining to introduce victim impact evidence at the penalty phase and instead simply asserting that there was nothing he could offer because the only person who could present such information was dead, the State relieved itself of its evidentiary burden.” (Scheuing’s brief, at 54.) Because Scheuing did not object to this statement when it was made, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
This Court has explained that “ ‘[a] prosecutor has a right to reply in kind to the argument of defense counsel. This “reply-in-kind” doctrine is based on fundamental fairness.’ Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999).” Thompson, 153 So.3d at 174.
Further,
“ ‘[p]rosecutors are to be allowed a wide latitude in their exhortations to the jury. Varner v. State, 418 So.2d 961 (Ala.Crim.App.1982). “Statements of counsel and argument must be viewed as in the heat of debate and must be valued at their true worth rather than as factors is the formation of the verdict.” Orr v. State, 462 So.2d 1013, 1016 (Ala.Crim.App.1984).’ ”
Albarran v. State, 96 So.3d 131, 183 (Ala.Crim.App.2011) (quoting Armstrong v. State, 516 So.2d 806, 809 (Ala.Crim.App.1986)).
*282 Contrary to Scheuing’s argument, the prosecutor’s comment was not factually and legally incorrect and did not relieve the State of its burden to present evidence. Rather, when viewed in light of the defense’s closing argument, the prosecutor merely replied to defense counsel’s argument relating to Scheuing’s recent religious transformation by informing the jury that it could not tell current stories about Cook because he had been murdered.
While giving his penalty-phase argument, defense counsel said: “There was another mitigator that was brought up, and I want to tell you this story.” (R. 1253.) He then went on to tell the jury that, while both defense attorneys were visiting Scheuing at the jail after the murder, Scheuing informed them that he was going to be baptized. Defense counsel stated that, when Scheuing told him that, counsel turned to the other attorney with “[his] eyes about that big.” (R. 1254.) After his attorney asked when his conversion had happened, Scheuing “started to tell [him] the story.” (R. 1254.) Counsel then told the jurors that Richard Green, a pastor who testified as a defense witness during the penalty phase, had “sat in [his] office and told [him] Jesse’s story.” (R. 1255.) Green, after speaking about bad things Scheuing had done, “shift[ed] gears and start[ed] talking about Jesse Scheuing today, the changes, he’[d] seen.” (R. 1256.)
When beginning his rebuttal closing argument, the prosecutor said:
“I can’t tell funny stories about Sean Cook. Can’t tell funny stories about whether or not Sean Cook was saved by Richard Green or not. The reason is because Sean Cook is dead, and I mention that solely for this reason. I don’t want you to forget it.”
(R. 1260.) Here, the prosecutor was not improperly telling the jury that he could not tell stories from the past about Cook. Nor was the prosecutor attempting to relieve the State’s burden to present evidence. Rather, the prosecutor was replying in kind to defense counsel’s argument — about Richard Green baptizing Scheuing and Scheuing’s story of change — by reminding the jury that Cook cannot be baptized by Green or tell his current story because he was murdered.
Because the prosecutor’s comment was a reply to the argument made by defense counsel, no error, much less plain error, occurred. See Rule 45A, Ala. R.App. P.; Thompson, 153 So.3d at 160. Therefore, this issue does not entitle Scheuing to any relief.
X.
Scheuing next asserts that the prosecutor improperly compared his rights with those of Cook. He specifically argues that the prosecutor improperly argued the following during penalty-phase rebuttal closing argument:
“Jesse Scheuing is now taking advantage of the process that’s been put in place a long time ago that has ensured that he receive a fair trial but that he also receive a recommendation from the jury after he is then allowed to put on everything he wants to put on with regard to any mitigating circumstances. He never gave Sean Cook that opportunity. He killed him before he ever gave him an opportunity to present any mitigating evidence whatsoever.”
(R. 1270) (emphasis added). Scheuing did not object to the prosecutor’s argument; therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
“Although this Court has frequently noted that a prosecutor should not compare *283 the rights of a victim with those of the defendant, we have held that such arguments rarely rise to the level of plain error.” Thompson, 153 So.3d at 171. “[Statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict.” Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989) (citing Orr v. State, 462 So.2d 1013, 1016 (Ala.Crim.App.1984), and Sanders v. State, 426 So.2d 497, 509 (Ala.Crim.App.1982)). In McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992), this Court noted:
“The prosecutor made numerous references to the victim’s rights and several times implied that her rights were to be weighed against the appellant’s. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict.”
McNair, 653 So.2d at 337-38 (citations omitted; emphasis added). See also Revis v. State, 101 So.3d 247, 296-97 (Ala.Crim.App.2011).
Here, the prosecutor’s comment was brief and merely pointed to a fact of which the jury was well aware, i.e., that the manner in which Scheuing murdered Cook was thoughtless. Because the comment of the prosecutor was brief and made in the heat of debate, it “did not rise to the level of plain error.” Thompson, 153 So.3d at 172.
XI.
Scheuing also alleges that the circuit court erroneously failed to instruct the jury on lesser-included offenses. Because Scheuing did not object to the jury instructions when given the opportunity by the circuit court, this Court’s review is limited to plain error.[11] See Rule 45A, Ala. R.App. P.
On appeal, Scheuing argues that the “circumstances of the offense [in his case] were such that jurors could reasonably conclude Mr. Scheuing did not have the intent to kill” (Scheuing’s brief, at 59) and that “a reasonable juror could have drawn the conclusion that [the characteristics of the murder] were attributable not to an inherently evil disposition, but to an underlying mental illness that precluded Mr. Scheuing from fully appreciating the consequences of his actions.” (Scheuing’s brief, at 60.)
“A defendant is entitled to a charge on a lesser-included offense only if there is any reasonable theory from the evidence to support the charge.” Pilley v. State, 930 So.2d 550, 562 (Ala.Crim.App.2005) (citing Ex parte Smith, 756 So.2d 957, 963 (Ala.2000)). This Court has held that “ ‘[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.’ Alabama Code 1975, § 13A-1-9(b) (emphasis added).” Bell v. State, 518 So.2d 840, 842 (Ala.Crim.App.1987); see also Ex parte Myers, 699 So.2d 1285, 1291 (Ala.1997) (“A charge on a lesser, non-capital offense is required only when there is a basis in the evidence which provides a reasonable theory supportive of the charge.” (citations and internal quotations omitted)). Here, there was no reasonable theory from the evidence to support the charge on lesser-included offenses.
At a pretrial hearing, defense counsel conceded “that there is no mental retarda *284 tion and that there is no mental disease or defect which rises to a legally justifiable level to where he would be not guilty by mental disease or defect.” (R. 50.) Further, during the guilt-phase closing argument, Scheuing’s counsel told the jury that Scheuing “[cjould have pled guilty, I suppose, would have been the only other thing he could have done. But, again, the death penalty is on the table. If they weren’t seeking to try to kill him, I assure you he would have pled guilty.” (R. 906.) Further, defense counsel did not offer any evidence or theories to support a lesser-included offense.
Because there was no reasonable theory from the evidence to support such a charge, no error, much less plain error, resulted from the circuit court’s failure to charge the jury on lesser-included offenses. See Rule 45A, Ala. RApp. P. Therefore, this issue does not entitle Scheuing to any relief.
XII.
Scheuing also asserts that the prosecutor erroneously stated during guilt-phase closing argument:
“What is reasonable doubt? We talked about this earlier. Some of the language in the case law over the years has said that the burden is not beyond all doubt. But a doubt is not just mere speculation, not fanciful conjecture, not guesswork, not a doubt you’ve hunted up, not a juror who sits back in the room and says, you know, there’s got to be more to this story, I can’t believe stuff like this happens. Sometimes the case is just what it is. You’ve seen clearly what occurred.”
(R. 899-900.) According to Scheuing, the prosecutor’s statement that “[yjou’ve seen clearly what occurred” was erroneous because: 1) it “eliminated [the burden of proof] by telling jurors that it had already been satisfied”; and 2) “the prosecutor effectively asked jurors to disregard their common sense in assessing whether reasonable doubt exists.” (Scheuing’s brief, at 62.) Because he raises these issues for the first time on appeal, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
In Jackson v. State, [Ms. CR-07-1208, Mar. 29, 2013] — So.3d-(Ala.Crim.App.2010), this Court addressed a claim that the prosecution had, during closing argument, minimized the burden of proof by arguing “that the [jurors] should rely on their gut feelings and look for the truth rather than holes or doubt in the case.” Jackson, — So.3d at-. This Court found no error under the plain-error standard, noting that “the trial court properly instructed the jury as to the reasonable-doubt standard and admonished the jury members that they were not to consider the arguments of counsel as evidence in the case.” Id.
In Brown v. State, 11 So.3d 866 (Ala.Crim.App.2007), this Court addressed a claim of error based upon the prosecutor’s argument: “Remember I told you, you would know it in your gut what’s reasonable doubt? You will know it in your gut. And I think you know it in your gut.” Brown, 11 So.3d at 910. This Court found no plain error because:
“The circuit court specifically instructed the jury that it was not to consider arguments of counsel as the arguments related to the law and that the court would instruct the jury as to the law applicable in the case. The court correctly instructed the jury on reasonable doubt. There is no evidence that the above argument so infected the trial with unfairness that Brown was denied a fair trial.”

Id.

Here, the prosecutor did not eliminate the State’s burden of proof by telling *285 jurors that it had already been satisfied, nor did the prosecutor ask jurors to disregard their common sense in assessing whether reasonable doubt exists. Rather, the prosecutor explained that fanciful speculation does not give rise to reasonable doubt and that the evidence the jury had seen and heard established Scheuing’s guilt beyond a reasonable doubt. There was nothing improper in the prosecutor’s argument. Furthermore, the circuit court instructed the jury: “What the attorneys have had to say, both for the state and for the defendant, they are not any evidence in this case.” (R. 916-17.) The court also correctly instructed the jury on reasonable doubt.
Accordingly, Scheuing has not established that the prosecutor’s argument was error, much less plain error. See Rule 45A, Ala. R.App. P.; Brown, 11 So.3d at 910. Therefore, this issue does not entitle Scheuing to any relief.
XIII.
Scheuing also asserts that the prosecutor improperly used his peremptory strikes in a manner that discriminated on the basis of gender. The Alabama Supreme Court has instructed:
“In J.E.B. v. Alabama, [511 U.S. 127 (1994),] the United States Supreme Court extended the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to apply to gender discrimination in jury selection. A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991).”
Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997). The Court used the factors established in Ex parte Branch, 526 So.2d 609 (Ala.1987), in addressing a claim of “gender discrimination in the jury selection process.” Trawick, 698 So.2d at 168. The Court also instructed that a “court may consider whether the State used all or most of its strikes against members of one gender.” Id.
Because Scheuing did not make a contemporaneous objection alleging gender discrimination in the jury-selection process, this Court reviews this claim for plain error only. See Rule 45A, Ala. R.App. P.
A.
Scheuing argues that an inference of discrimination exists because “the State used 23 of its 34 peremptory strikes to remove female veniremembers.” (Scheuing’s brief, at 64-65.) Although he cites Ex parte Thomas, 659 So.2d 3, 5 n. 1 (Ala.1994), in support of his assertion that “[a] large number of peremptory strikes alone can establish a prima facie case of discrimination,” the Alabama Supreme Court has recognized that “ ““ “it is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find, a prima facie case of ... discrimination.” ”” ” Williford v. Emerton, 935 So.2d 1150, 1157 (Ala.2004) (quoting McElemore v. State, 798 So.2d 693, 696 (Ala.Crim.App.2000), quoting in turn other cases).
Further, Scheuing’s jury included four women. The fact that 33% of the jury consisted of women undermines Scheuing’s argument based on numbers and tends to indicate that the prosecutor did not use his peremptory strike to discriminate against women. See McCray v. State, 88 So.3d 1, 24 (Ala.Crirh.App.2010) (“ ‘ “Of course, the fact that [women] are ultimately seated on the jury does not necessarily bar a finding of discrimination under [J.E.B. v. Alabama, 511 U.S. 127 (1994),] see [United *286 States v.] Battle, 836 F.2d [1084,] 1086 [ (8th Cir.1987) ], but the fact may be taken into account in a review of all the circumstances as one that suggests that the government did not seek to rid the jury of persons who shared the [same gender].” United States v. Young-Bey, 893 F.2d 178, 180 (8th Cir.1990).’ ” (quoting Mitchell v. State, 579 So.2d 45 (Ala.Crim.App.1991)) (emphasis omitted)). Based on these circumstances, this Court cannot say that the State’s use of 23 of its 34 peremptory strikes to remove female venire-members raises an inference of discrimination.
B.
Scheuing next claims that the “female veniremembers struck by the State were as heterogeneous as the community as a whole, and the only characteristic they shared in common was their gender.” (Scheuing’s brief, at 65.) According to Scheuing, the “struck female venire-members were diverse in terms of their race, ages, occupations, and their medical and economic conditions.” (Scheuing’s brief, at 66.) From there, Scheuing asserts that the “heterogeneity of the struck female veniremembers indicates that the only characteristic that they shared in common was their gender.” (Scheuing’s brief, at 67.) This Court disagrees.
The record demonstrates that 14 of the 23 female veniremembers the State struck expressed reluctance to recommend, or opposition to, the death penalty. On the other hand, the women who were selected to serve on Scheuing’s jury all expressed support for the death penalty. This Court has noted that opposition to the death penalty is a valid reason for the State to strike veniremembers. See, e.g., Talley v. State, 687 So.2d 1261, 1269 (Ala.Crim.App.1996); see also Hyde v. State, 778 So.2d 199, 223 (Ala.Crim.App.1998) (reservations about the death penalty constituted a race-neutral ground for a peremptory strike). Further, two women who were struck had indicated that they would have had problems viewing the evidence in this ease. Two other women who were struck indicated that they had a husband or ex-husband serving a prison sentence. Another woman who was struck had a husband who had been charged with and acquitted of assault. Finally, one woman who was struck had a family member who was being tried for a crime similar to the one for which Scheuing was being tried.
It appears that the State struck men with similar characteristics. Men that voiced any opposition to the death penalty were struck. Thus, none of the jurors that served on Scheuing’s jury opposed the death penalty. Further, men were struck who had family members charged and/or convicted of crimes similar to the crimes for which Scheuing was being tried.
Based on these facts, this Court holds that Scheuing has not established that the women struck by the State were heterogeneous. Therefore, this factor does not raise an inference of discrimination.
C.
Scheuing next argues that “female veniremembers with the same characteristics as male veniremembers received disparate treatment and were struck by the State,” and he supports this argument by writing: “The struck female venire-members and the male veniremembers allowed to serve on Mr. Scheuing’s jury shared most if not all of the characteristics elicited by the 'juror questionnaire.” (Scheuing’s brief, at 68.) As with his Bat-son argument we addressed in Part I of this opinion, Scheuing arrives at this conclusion by viewing the venire through a wide lens, addressing characteristics such as age, area of residence, occupations, etc. *287 Based upon this viewing, he argues that the “State’s disparate treatment of similarly situated female and male venire-members supports an inference of discrimination.” (Scheuing’s brief, at 68.)
As established in subsection B of Part I, however, when viewing the same venire through a lens narrowly focused on issues of importance to attorneys striking a jury for a capital murder, it is apparent that there was no “disparate treatment of similarly situated female and male venire-members supporting] an inference of discrimination.” (Scheuing’s brief, at 68.) Rather, the record indicates that the State similarly struck both men and women, i.e., men and women who voiced reluctance relating to the death penalty and who had family members that were charged and/or convicted of crimes similar to the crimes for which Scheuing was being tried. Accordingly, Scheuing has failed to establish that the State treated men and women disparately.
D.
Although Scheuing makes no argument relating to the remaining Branch factors, this Court has reviewed the record and holds that the record does not indicate that there was a pattern to the State’s use of its peremptory strikes against women, that the prosecutor had a history of discrimination, or that men and women were questioned disparately during voir dire. Accordingly, the record does not raise an inference that the State used its peremptory strikes in a manner that discriminated against women. White, — So.3d at-. Therefore, this issue does not entitle Scheuing to any relief.
XIV.
Next, Scheuing argues that “the District Attorney erroneously informed the jury that he represented the victims in the case.” (Scheuing’s brief, at 71.) He specifically complains of the following comments the prosecutor made during voir dire: “My job is, again, I represent my victims, Sean Cook and Jacqueline Williams.” (R. 220); “My job — I represent Sean Cook who can’t be here because he’s dead. And I’m his voice and I’m going to represent him throughout this trial.” (R. 294); “I represent [Sean Cook] in seeking justice.” (R. 303); and “I represent Sean Cook. And he’s dead, and he can’t be here today.” (R. 381.) Because Scheuing did not object to any of these statements at trial, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
In Johnson v. State, 120 So.3d 1130 (Ala.Crim.App.2009), this Court addressed a similar argument and stated:
“This Court has held that a prosecutor’s comments that he or she represented or spoke for the victim’s family is not erroneous. ‘We have held that it is not reversible error for a prosecutor to suggest that he is speaking on behalf of the victim’s family. See Slaton v. State, 680 So.2d 879, 906-07 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997).’ Burgess v. State, 723 So.2d [742] at 754 [ (Ala.Crim.App.1997) ].”
Johnson, 120 So.3d at 1190. In Slaton, this Court instructed that it is not “reversible error when the prosecutor briefly suggests that he is speaking on behalf of the victim’s family.” Slaton v. State, 680 So.2d 879, 906 (Ala.Crim.App.1995) (citing Henderson v. State, 583 So.2d 276, 286 (Ala.Crim.App.1990)).
In this case, the record demonstrates that the prosecutor’s references to representing and speaking for the victims were limited and brief. This Court, therefore, holds that the prosecutor’s comments did *288 not rise to the level of plain error. See Rule 45A, Ala. R.App. P.
XV.
Scheuing next argues that the “delay of over 21 months in the prosecution of Mr. Scheuing denied him his right to a speedy trial.” (Scheuing’s brief, at 74.) Because Scheuing raises this issue for the first time on appeal, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
“An accused’s right to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution. ...” Ex parte Walker, 928 So.2d 259, 263 (Ala.2005) (footnotes omitted). In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court “identified] some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right [to a speedy trial].” Barker, 407 U.S. at 530. Those factors are: “[l]ength of [the] delay, the reason for the delay, the defendant’s assertion of his right, and prejudice to the defendant.” Id. (footnote omitted).
We have written:
“In Ex parte Walker, 928 So.2d 259 (Ala.2005), the Alabama Supreme Court stated:
“ ‘ “A single factor is not necessarily determinative, because this is a ‘balancing test, in which the conduct of both the prosecution and the defense are weighed.’ ” Ex parte Clopton, 656 So.2d [1243] at 1245 [(Ala.1985)] (quoting Barker [v. Wingo ], 407 U.S. [514] at 530 [ (1982) ]). We examine each factor in turn.’
“928 So.2d at 263.”
Boyle v. State, 154 So.3d 171, 192 (Ala.Crim.App.2010).
A.
“The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance.” Barker, 407 U.S. at 530. “In Alabama, ‘[t]he length of delay is measured from the date of the indictment or the date of the issuance of an arrest warrant — whichever is earlier — to the date of the trial.’ ” Ex parte Walker, 928 So.2d 259, 264 (Ala.2005) (quoting Roberson v. State, 864 So.2d 379, 394 (Ala.Crim.App.2002)).
Although Scheuing argues that the 21-month delay between his arrest and the beginning of his trial is presumptively prejudicial, this Court does not agree. Scheuing is correct that courts, including this one, have found delays of less than 21 months to be presumptively prejudicial. See, e.g., Ingram v. State, 629 So.2d 800 (Ala.Crim.App.1993) (delay of 19 months was presumptively prejudicial); Beaver v. State, 455 So.2d 253 (Ala.Crim.App.1984) (delay of 16 months was presumptively prejudicial); Kelley v. State, 568 So.2d 405 (Ala.Crim.App.1990) (delay of 15 months was presumptively prejudicial). None of those cases, however, involved a charge of capital murder. The defendant in Beaver, for example, had been charged with first-degree theft. Beaver, 455 So.2d at 254. The charges in Kelley were first-degree kidnapping and first-degree robbery. Kelley, 568 So.2d at 406-07. This Court is unaware of, and Scheuing does not cite, any Alabama capital-murder case in which a delay of 21 months was considered presumptively prejudicial.[12] In Alabama, de *289 lays that were much longer than 21 months have been held to be presumptively prejudicial in capital-murder cases. See, e.g., Boyle, 154 So.3d at 231 (delay of 48 months was presumptively prejudicial); Morris v. State, 60 So.3d 326, 353 (Ala.Crim.App.2010) (delay of 73 months was presumptively prejudicial). In Smelley v. State, 564 So.2d 74 (Ala.Crim.App.1990), this Court refused to recognize that a delay of 28 months in a capital-murder case was presumptively prejudicial; however, it chose “to address the remaining [Barker ] factors.” Smelley, 564 So.2d at 82. As in Smelley, although holding that a delay of 21 months is not presumptively prejudicial, this Court will address the other Barker factors.
B.
The second Barker factor is the reason for the delay. Barker, 407 U.S. at 530. This Court has recognized:
“In [Ex parte ] Walker, 928 So.2d [259,] 265 [ (Ala.2005) ], the Supreme Court set forth the following standard for evaluating the reasons for the delay:
“ ‘Barker[ v. Wingo, 407 U.S. 514 (1972),] recognizes three categories of reasons for delay: (1) deliberate delay, (2) negligent delay, and (3) justified delay. 407 U.S. at 531, 92 S.Ct. 2182. Courts assign different weight to different reasons for delay. Deliberate delay is “weighted heavily” against the State. 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101. Deliberate delay includes an “attempt to delay the trial in order to hamper the defense” or “‘to gain some tactical advantage over (defendants) or to harass them.’ ” 407 U.S. at 531 & n. 32, 92 S.Ct. 2182 (quoting United States v. Marion, 404 U.S. 307, 325, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)). Negligent delay is weighted less heavily against the State than is deliberate delay. Barker, 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101; Ex parte Carrell, 565 So.2d [104,] 108 [(Ala.1990) ]. Justified delay — which includes such occurrences as missing witnesses or delay for which the defendant is primarily responsible — is not weighted against the State. Barker, 407 U.S. at 531, 92 S.Ct. 2182, 33 L.Ed.2d 101; Zumbado v. State, 615 So.2d 1223, 1234 (Ala.Crim.App.1993) (“ ‘Delays occasioned by the defendant or on his behalf are excluded from the length of delay and are heavily counted against the defendant in applying the balancing test of Barker.’ ”) (quoting McCallum v. State, 407 So.2d 865, 868 (Ala.Crim.App.1981)).’ ”
Brown v. State, 74 So.3d 984, 1012-13 (Ala.Crim.App.2010).
Here, the record indicates that the State neither deliberately nor negligently caused the delay. In Brown, this Court arrived at the same conclusion even though the State had requested three continuances. Id. at 1013. The record does indicate, however, that, because Scheuing fled to Michigan and ultimately Iowa after committing his crimes in Alabama, and because Scheuing was raised in Georgia, extensive work on behalf of defense counsel was required.
On April 29, 2010, Scheuing filed a “Motion for Extraordinary Expenses.” (R. 43.) In that motion, counsel asked for expenses in the amount of $2,500 to cover *290 travel expenses related to interviewing witnesses in Iowa. That motion was granted by the circuit court. (R. 45.) On May 14, 2010, the defense filed another “Motion for Extraordinary Expenses,” related to travel to Waycross, Georgia, to “meet with the mitigation expert” in the case. (R. 51.) That motion was also granted by the circuit court. (R. 53.) Another “Motion for Extraordinary Expenses” was filed by defense counsel on August 24, 2010, this time related to travel to Waycross, Georgia, for the purposes of trial preparation. (R. 75.) That motion was granted on August 26, 2010.
At a pretrial hearing held on August 27, 2010, the State informed the circuit court that the prosecutors and defense counsel had “travelled] together to Iowa to talk to individual witnesses.” (R. 34.) At that same hearing, defense counsel indicated that all four attorneys involved in the case had “met numerous times” (R. 43) and that defense counsel had met on two occasions with the psychologist they had consulted in the case.
The record demonstrates, therefore, that the 21-month delay was neither deliberately nor negligently caused by the State. As such, this factor is not weighted against the State.
C.
The third Barker factor is the assertion of his right by the defendant. Barker, 407 U.S. at 530. In Barker, the United States Supreme Court provided this guidance:
“Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant’s assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.”
Id. at 531-32.
Scheuing never asserted below his right to a speedy trial. His failure to do so “make[s] it difficult for [him] to prove that he was denied a speedy trial.” Id. Accordingly, this factor weighs against Scheuing.
D.
The fourth Barker factor is the “prejudice to the defendant.” Id. at 532. It, like the other factors, also weighs against Scheuing. The Alabama Supreme Court has written:
“The United States Supreme Court has recognized three types of harm that may result from depriving a defendant of the right to a speedy trial: ‘“oppressive pretrial incarceration,” “anxiety and concern of the accused,” and “the possibility that the [accused’s] defense will be impaired” by dimming memories and loss of exculpatory evidence.’ Doggett [v. United States ], 505 U.S. [647,] 654, 112 S.Ct. 2686 [ (1992) ] (quoting Barker[ v. Wingo ], 407 U.S. [514,] 532, 92 S.Ct. 2182 [ (1972) ], and citing Smith v. Hooey, 393 U.S. 374, 377-79, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969); United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966)). ‘Of these forms of prejudice, “the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.’” 505 U.S. at 654, 112 S.Ct. *291 2686 (quoting Barker, 407 U.S. at 582, 92 S.Ct. 2182).”
Ex parte Walker, 928 So.2d at 267.
Although Scheuing asserts that, due to the delay, “he suffered from anxiety and emotional stress” (Scheuing’s brief, at 77), no evidence supporting that assertion appears in the record. Accordingly, Scheu-ing has failed to establish prejudice as a result of any delay.
Based on the foregoing, this Court holds that Scheuing has failed to establish that a violation of his right to a speedy trial occurred, much less that the circuit court committed plain error by failing to notice one. See Rule 45A, Ala. R.App. P. Consequently, this issue does not entitle Scheuing to any relief.
XVI.
Scheuing next argues that the circuit court erred by failing to sua sponte remove veniremembers C.W. and M.Z. Because Scheuing did not raise this issue before the circuit court, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
Scheuing argues that veniremembers C.W. and M.Z. should have been removed because they answered affirmatively to the following question during voir dire:
“You may be sitting here thinking, hey, what’s happening with my business or my family or any other number of issues. And you may not be able to give me or the defense your complete attention. I won’t ask you why, but is there anybody that fits that category, there’s other things that you need to be doing other than sitting here?”
(R. 405.)
The statutory grounds for which a juror may be struck for cause are found in § 12-16-150, Ala.Code 1975. Those grounds do not include a juror who would not be able to give his complete attention to the trial. “In addition to the grounds set out in § 12-16-150, there are common-law grounds for challenging a venire-member for cause when those grounds are not inconsistent with the statute.” Ex parte Killingsworth, 82 So.3d 761, 764 (Ala.2010).
Caselaw also does not assist Scheuing. None of the cases he cites in support of his argument hold that a court erred in not striking a veniremember- for cause due to an inability of the veniremember to give the trial his or her complete attention. To the contrary, in Maldonado v. State, 998 S.W.2d 239 (Tex.Crim.App.1999), the Court of Criminal Appeals of Texas affirmed a capital-murder conviction despite a claim that “the trial court committed reversible error in failing to strike prospective juror [D.] where the venireman stated he could not give the trial his full attention.” Maldonado, 998 S.W.2d at 248. Similarly, in State v. Hentley, 752 S.W.2d 375 (Mo.Ct.App.1988), the Missouri Court of Appeals upheld a conviction for robbery and armed criminal action despite a claim that the lower court had erred when it denied Henley’s motion to strike a particular juror for cause after the juror “indicated that he might have difficulty in focusing on the evidence because he was on medication and that he had sold his home and was dwelling on getting another home.” Hentley, 752 S.W.2d at 376.
Here, the two veniremembers positively answered a question indicating that they might not give the trial their full attention when thinking of matters in their lives. The veniremembers’ responses do not appear to rise to the level of a strike for cause, and the circuit court did not commit plain error by failing to remove them without any motion from defense counsel. Therefore, this issue does not entitle Scheuing to any relief.
*292 XVII.
Scheuing next argues that “the trial court [erroneously] failed to remove Juror T.H. from the venire.” He specifically argues that T.H. should have been removed because, during voir dire, he stated “that he could not vote for life imprisonment without parole.” (Scheuing’s brief, at 79.) Because Scheuing did not raise this issue before the circuit court, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
During jury selection, the record reveals the following exchange between the prosecutor and veniremember T.H.:
“[Prosecutor]: Does anybody feel the other way, that based on my upbringing, my personal belief, I would always vote for the death penalty; if you kill somebody, then your life should end? Anybody feel that way? Yes, sir. Your name?
“[T.H.]: [T.H.]”
(R. 227.)
Later, during questioning by defense counsel, the following exchange occurred:
“[Defense counsel]: All right. Mr. [T.H.] If the state proves to you an intentional killing in this case with no justification, no self-defense, things like that, do you believe the death penalty is appropriate?
“[T.H.]: Yes, sir.
“[Defense counsel]: Do you believe it’s the only appropriate penalty?
“[T.H.]: No.
“[Defense counsel]: You do not. So you would be willing to take into account whatever mitigation evidence we put on on behalf of our client about his upbringing, about the fact he may have had some mental health issues throughout his youth and teenage years that weren’t addressed properly, the fact he may have been using drugs, things like that, would you take that into account?
“[T.H.]: Yes.”
(R. 268.)
In Williams v. State, 601 So.2d 1062 (Ala.Crim.App.1991), this Court explained:
“The ‘standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror’s views would “prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.” ’ Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). See also Haney v. State, 603 So.2d 368 (Ala.Crim.App.1991)... In reaching its decision to exclude a juror for cause, the trial court need not determine whether this impairment has been demonstrated with ‘unmistakable clarity.’ Wainwright, supra 469 U.S. at 424, 105 S.Ct. at 852. It is sufficient if the trial court, after taking into consideration the veniremember’s answers and demeanor, ‘is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.’ Wainwright, supra at 426, 105 S.Ct. at 853. See also Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (198[6]); Whisenhant v. State, 555 So.2d 219 (Ala.Crim.App.[1988]), aff'd, 555 So.2d 235 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990); Brownlee v. State, 545 So.2d 151 (Ala.Crim.App.1988), aff'd, 545 So.2d 166 (Ala.1989), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989).”
Williams, 601 So.2d at 1069.
Because upon questioning from defense counsel T.H. indicated that the death penalty was not the only appropriate punishment for an intentional killing and because *293 he indicated that he would consider mitigation evidence, the circuit court did not err in failing sua sponte to remove him for cause.
XVIII.
Next, Scheuing argues that the circuit court erred by failing to “instruct jurors what to do if the weight of the aggravating circumstances was equal to that of the mitigating circumstances.” (Scheuing’s brief, at 82.) Because, at the conclusion of the circuit court’s instructions, Scheuing did not object to the instructions, this Court’s review is limited to plain error. See Rule 45A, Ala. R.App. P.
In Mills v. State, 62 So.3d 574 (Ala.2010), a case that Scheuing acknowledges, the Alabama Supreme Court upheld a death sentence after considering a similar argument. The Court explained that “the trial court’s instructions, taken as a whole, clearly informed the jury that the only way it could recommend a sentence of death was if the jury determined that aggravating circumstances existed and that those aggravating circumstances outweighed the mitigating circumstances.” Mills, 62 So.3d at 601.
Here, during the penalty phase, the circuit court instructed the jurors:
“So now then, ladies and gentlemen, if after a full and fair consideration of all of the evidence in the case if you then are convinced beyond a reasonable doubt that there is at least one aggravating circumstance, that it exists, and you are convinced that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances, then [death] would be the verdict form that you would then return.”
(R.1298.) .
“Now, on the other hand, ladies and gentlemen, if after a full and fair consideration of all of the evidence if you’re not convinced beyond a reasonable doubt that the aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances, if any, your verdict then would be: ‘We, the jury, recommend that the defendant, Jesse Earl Scheuing, be punished by life imprisonment without parole.’ ”
(R. 1299.)
Here, the circuit court’s instructions clearly informed the jury that it could recommend a sentence of death only if the aggravating circumstances outweighed the mitigating circumstances. Mills, 62 So.3d at 601. Therefore, no error, much less plain error, occurred. See Rule 45A, Aa. RApp. P.
XIX.
Scheuing next argues that his sentence of death violates the decision of the Supreme Court of the United States in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), for a number of reasons. Scheuing did not raise these arguments at trial; therefore, this Court’s review is limited to plain error only. See Rule 45A, Ala. R.App. P.
A.
Scheuing first argues that, under Ring, his sentence of death was unlawfully imposed because “the jury in [his case] unknowingly made the determination that the defendant should be eligible to die at the first phase of trial, thereby rendering its consideration of sentencing phase mitigation and aggravation superfluous.” (Scheuing’s brief, at 86.) This claim, however, cannot stand under Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), a case that he acknowledges. In Ex parte Waldrop, the Alabama Supreme Court, following the United States Supreme Court’s decisions in Ring, supra, and Apprendi v. New Jer *294 sey, 530 U.S. 466, 120 S.Ct. 2848, 147 L.Ed.2d 435 (2000), upheld Alabama’s capital-punishment sentencing scheme. In her special concurrence, Justice Stuart explained why Alabama’s sentencing scheme complied with those cases:
“By finding a defendant guilty of the capital offense during the guilt phase, an Alabama jury makes the factual determinations that an intentional murder occurred, that an aggravating factor was present, and that the defendant is eligible for the maximum punishment for the offense — death.
“It appears to me that confusion arises because a defendant convicted in Alabama of a capital offense is provided with additional due process through a sentencing-phase hearing before a jury. The fact that the Alabama statutory scheme allows a jury to hear evidence of the aggravating circumstances and the mitigating circumstances to determine the propriety of a death sentence and to recommend whether the maximum punishment of death is warranted does not obviate the fact that the jury’s verdict of guilty of capital murder in the guilt phase establishes the potential for the imposition of the death penalty. Consequently, it appears to me that Alabama’s capital-punishment scheme, regardless of whether the aggravating circumstances enumerated in § 13A-5^49, Ala. Code 1975, are found beyond a reasonable doubt by a jury, meets the procedural mandates of Apprendi[ v. New Jersey, 530 U.S. 466 (2000),] and Ring[ v. Arizona, 536 U.S. 584 (2002) ]. Indeed, our scheme appears to be exactly what the Supreme Court envisioned when it stated:
“ ‘ “Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the •sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed.... The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge.” ’
“Apprendi, 530 U.S. at 497, 120 S.Ct. 2348 (quoting Almendarez-Torres v. United States, 523 U.S. 224, 257 n. 2, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998)):”
Ex parte Waldrop, 859 So.2d at 1194-95 (Stuart, J., concurring specially).
Under Ex parte Waldrop, the circuit court correctly instructed the jury that its verdict in the guilt phase “established] by law the existence of [one] aggravating circumstance.” Therefore, this issue is without merit.
B.
Next, Scheuing argues that “the death sentence in this case was unlawfully imposed because jurors were explicitly misinformed about the significance of their role in the sentencing process when the trial court referred to the jury’s role as one of ‘recommending' a sentence on over fifty occasions.” (Scheuing’s brief, at 87.)
This Court recently addressed a similar argument in Jackson v. State, [Ms. CR-07-1208, Mar. 29, 2013] — So.3d - (Ala.Crim.App.2013), explaining:
“ ‘ “In Alabama the trial judge is the sentencing authority, and the jury’s advisory verdict is a recommendation that is not binding on the judge. § 13A-5-47(a), (e), Ala.Code 1975; Ex parte Carroll, 852 So.2d 821, 826-27 (Ala.2001).” ’ Jackson v. State, 133 So.3d 420, 447 *295 (Ala.Crim.App.2012), quoting Woodward v. State, 123 So.3d 989, 1033 (Ala.Crim.App.2011). Moreover, this Court has previously determined that a trial court’s instruction to the jury that its verdict is advisory or a recommendation does not violate Ring v. Arizona [, 536 U.S. 584 (2002) ]. In Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005), this Court opined:
“ ‘Irvin argues that Ring prohibits the trial judge from instructing the jury that its verdict is advisory. Rejecting a similar claim in Duke v. State, 889 So.2d [1,] 43 (Ala.Crim.App.2002) (opinion on return to remand), this Court noted:
“ ‘ “Duke also argues that Ring requires penalty-phase relief when the jury is told that its verdict is ‘advisory’ or merely a ‘recommendation.’ Contrary to Duke’s contention, Ring does not address the advisory nature of a jury’s sentencing recommendation. Duke’s jury was properly informed that under Alabama law, its verdict was an advisory one. See § 13A-5-46, Ala.Code 1975. Thus, the jury was not misled regarding its role in the sentencing decision. See Caldwell v. Mississippi, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).”
“‘Here, the circuit court properly instructed the jury of its role under § 13A-5-46, Ala.Code 1975, taking care to emphasize the fact that its verdict was merely advisory did not absolve the jury of its responsibility in determining the appropriateness of the death sentence. Indeed, the court .instructed the jury:
“ ‘ “The weighing and comparing of aggravating and mitigating circumstances requires the exercise of good, sound judgment on your part. It is not a matter of unbridled discretion.
“ ‘ “A human life hangs in the balance. It is a matter of calm reflection, not for indulgence of emotion. You’re to weigh the aggravating and mitigating circumstances and honestly and rationally evaluate the two options before you in light of those circumstances. Your verdict, as always, is based on the evidence.”
“ ‘Our review of the record indicates that the circuit court properly instructed the jury of its role in the sentencing process under Alabama law. The court’s instructions did not run afoul of either Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), or Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). No basis for relief exists as to this claim.’
“940 So.2d at 366.”
Jackson v. State, — So.3d at-.
Although Scheuing directs our attention to Ex parte McGriff, 908 So.2d 1024 (Ala.2004), and quotes the Alabama Supreme Court when it directed that “[a]t no time during a retrial of the charge against [the defendant] should the jury be told that its decision on the issue of whether the proffered aggravating circumstance exists is ‘advisory’ or ‘recommending,’ ” Ex parte McGriff, 908 So.2d at 1038, he fails to acknowledge that this Court has explained:
“The Supreme Court made this statement in [Ex parte ] McGriff [, 908 So.2d 1024 (Ala.2004),] because there was no corresponding element of the capital offense that was also an aggravating circumstance that would elevate McGriff s *296 penalty to death. In McGriff, the capital offense was murder committed by the use of a deadly weapon from a vehicle. There is no aggravating circumstance that corresponds to any element of that capital offense.
“In this case, however, the jury had already found beyond a reasonable doubt that Brown committed the murder during the course of a robbery and a burglary, both aggravating circumstances that would support a sentence of death. The jury’s verdict at the guilt phase made Brown eligible for the death penalty. Accordingly, there is no violation of the Supreme Court’s holding in McGriff. See Blackmon v. State, [246 Ala. 675, 22 So.2d 29 (1945) ].”
Brown v. State, 11 So.3d 866, 923 (Ala.Crim.App.2007).
In the guilt phase of this case, the jury convicted Scheuing of intentionally killing Cook during a robbery in the first degree in violation of § 13A-5^40(a)(2), Ala.Code 1975. It was not error, therefore, for the jury to be informed by the circuit court, the prosecutor, or the defense counsel that, in arriving at a penalty-phase verdict, it was making a sentencing recommendation to the judge.
XX.
Although acknowledging Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), Scheuing next asserts that the death-qualification process is unconstitutional. He specifically argues that it is unconstitutional because: 1) “death qualified juries are significantly more prone to convict than ordinary juries”; 2) “the process of pretrial death qualification, in which the defendant’s guilt is assumed, conditions the jury towards guilt”; and 3) “death qualification disproportionately excludes minorities and women.” (Scheuing’s brief, at 88.) He cites Justice Marshall’s dissent in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), in support of his argument.
His argument is, of course, precluded by the majority opinion in Lockhart, in which the United States Supreme Court answered the question whether “the Constitution prohibits] the removal for cause, prior to the guilt phase of a bifurcated capital- trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial?” Lockhart, 476 U.S. at 165. It held “that it does not.” Id.
In addition to the authority of Lockhart, this Court has “repeatedly upheld the practice of death-qualifying prospective jurors in a capital-murder case.” Scott v. State, [Ms. CR-08-1747, Oct. 5, 2012] — So.3d -, - (Ala.Crim.App.2012).. Therefore, no error resulted from the fact that the jury was death-qualified.
Scheuing also argues that “the refusal to allow a cognizable group, such as jurors opposed to the death penalty, to sit on the jury violated their [constitutional] rights.... ” (Scheuing’s brief, at 89-90.) In Lockhart, however, the United States Supreme Court instructed:
“‘Witherspoon[ v. Illinois, 391 U.S. 510 (1968),]-excludables,’ or for that matter any other group defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case, may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement.”
Lockhart, 476 U.S. at 176-77. This argument is precluded by precedent.
*297 XXI.
Finally, Scheuing argues that the manner of execution in Alabama constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. His argument addresses both lethal injection and electrocution.
Scheuing argues that Alabama’s “evolving and seemingly undeveloped procedures for administering lethal injection and the cruelty of lethal injection violate ‘the evolving standards of decency that mark the progress of a maturing society.’ ” (Scheuing’s brief, at 91) (quoting Atkins v. Virginia, 536 U.S. 304, 311-12, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), quoting in turn Trop v. Dulles, 356 U.S. 86, 100-01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).
This issue has been addressed by both the Alabama Supreme Court and the United States Supreme Court. In Ex parte Belisle, 11 So.3d 323 (Ala.2008), the Alabama Supreme Court stated:
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze [v. Rees, 553 U.S. 35, 62,] 128 S.Ct. [1520,] 1538 [ (2008) ], and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, [553 U.S. at 61,] 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, [553 U.S. at 114,] 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, [553 U.S. at 121,] 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, [553 U.S. at 50,] 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 339. See also Vanpelt v. State, 74 So.3d 32, 90-91 (Ala.Crim.App.2009) (holding that lethal injection as a means of administering the death penalty is not unconstitutional).
Because this issue has been raised in and rejected by the Alabama Supreme Court, the United States Supreme Court, and this Court, it is without merit. Therefore, Scheuing is not entitled to any relief on this issue.
Scheuing also argues that “[t]he procedures, equipment, personnel and other circumstances surrounding execution by electrocution in Alabama present punishment which is qualitatively more cruel and unusual than any civilized society should tolerate.” (Scheuing’s brief, at 91.) Because, under § 15-18-82.1(a), Ala.Code 1975, the primary method of execution is lethal injection, this argument is moot. See, e.g., Lewis v. State, 889 So.2d 623, 689 (Ala.Crim.App.2003).
*298 XXII.
As this Court is required to do under § 13A-5-53, Ala.Code 1975, it now addresses the propriety of Scheuing’s capital-murder conviction and his sentence of death. Scheuing was indicted for, and was convicted of, murdering Cook during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended, by a vote of 10 to 2, that Scheuing be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Scheuing to death.
The record demonstrates that Scheu-ing’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A — 5—53(b)(1), Ala. Code 1975.
The circuit court found two aggravating circumstances. The first was “that the capital offense was committed by a person under sentence of imprisonment,” pursuant to § 13A-5-49(l), Ala.Code 1975, and the second was “that this capital offense was committed while the defendant was engaged in the commission of a ... robbery in the first degree,” pursuant to § 13A-5^9(4), Ala.Code 1975. (R. 1232-33.) The circuit court found the existence of one statutory mitigating circumstance, that Scheuing was 22 years old at the time of the murder, pursuant to § 13A-5-51(7), Ala.Code 1975. The circuit court also found “[Scheuing’s] difficult life, upbringing and his possible diagnosis of fetal alcohol syndrome, difficulty in his schooling, and his acceptance of the Christian faith and his expressed remorse for his actions” as nonstatutory mitigating circumstances. (C. 96.) The circuit court further found “that the mitigating circumstances when balanced against each aggravating circumstance alone and the two aggravating circumstances collectively do not outweigh the weight of those two aggravating circumstances.” (R. 1336.) The circuit court then sentenced Scheuing to death.
Having independently weighed the aggravating and mitigating circumstances as this Court is required to do under § 13A-5-53(b) (2), Ala.Code 1975, this Court is convinced, as was the circuit court, that a sentence of death is the appropriate sentence in this case.
Further, Scheuing’s death sentence is neither disproportionate nor excessive when compared to the penalties imposed in similar cases. § 13A-5-53(b)(3), Ala.Code 1975. See Brown, 11 So.3d at 933 (collection of cases involving burglary, robbery, and murder).
XXIII.
Rule 45A, Ala. R.App. P., also requires this Court to search the record for any eiTor that may have adversely affected Scheuing’s substantial rights. This Court has done so and finds no error that has affected Scheuing’s substantial rights.
For the forgoing reasons, Scheuing’s convictions and his sentences are affirmed.
AFFIRMED.
WELCH, KELLUM, and BURKE, JJ„ concur. WINDOM, P.J., concurs specially, with opinion. JOINER, J., concurs specially, with opinion.

. Although the store was referred to as "Pak-a-Sak,” the legal name of the entity was "You-sef Yaqoub, Incorporated, doing business as Express Mart Number 11.” (R. 623.)

. "Munchies” is a term used to describe an increased appetite brought about by the smoking of marijuana.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. This is apparently a reference to a Michigan homeless shelter where Scheuing had spent part of one night.

. This number includes the African-American veniremembers to which Scheuing raised a Batson objection. In reviewing whether the record raises an inference of discrimination under plain error, the Court must include in its analysis all African-American venire-members who were struck, not just those to which no objection was raised.

. It is not clear from the questionnaire whether both charges listed applied to both A.G.’s nephew and his brother or whether just one charge applied to each man and, if so, which applied to which relative.

. The argument made by counsel indicates that he intended to refer to Marilynn Scheu-ing, Scheuing's adoptive mother, but he used the first name of Scheuing's birth mother.

. The record demonstrates that, just before beginning its deliberations, the jury took a break. The record also demonstrates that, from 10:11 a.m. and 10:40 a.m., the jury took the break, elected T.K. as the foreman, voted ‘'guilty” in both cases, and notified the court of its verdicts.

. The exact day on which the Sportage and the pistol were stolen was not established at trial.

. Although this statement indicates that the individual who took Palmer’s purse was driving a Chevrolet Tahoe, this appears to be a misidentification of the make and model of the vehicle.

. Nor did Scheuing request any instructions regarding lesser-included offenses.

. This Court is aware that in Booker v. State, 5 So.3d 411 (Miss.Ct.App.2008), the Court of Appeals of Mississippi held that a delay of 16 months between arrest and trial date for a *289 charge of capital murder was presumptively prejudicial. The Mississippi courts have, however, adopted a rule in which "[a]ny delay in excess of eight months is considered presumptively prejudicial and requires a consideration of the other Barker factors.” Booker, 5 So.3d at 421 (citing Smith v. State, 550 So.2d 406, 408 (Miss.1989)). Alabama courts have not adopted such a mechanical rule.